## NATIONAL BANK OF COMMERCE OF KANSAS CITY v. ATKINSON.

(Circuit Court, D. Kansas. April 11, 1893.)

No. 6,850.

1. NATIONAL BANKS—ULTRA VIRES—ACCOMMODATION INDORSERS.

A national bank cannot loan its credit or become an accommodation indorser.

2. SAME—POWERS OF PRESIDENT—EXECUTION OF NOTE.

The president of a national bank has no power inherent in his office to bind the bank by the execution of a note in its name, but power to do so may be conferred on him by the board of directors, either expressly, by resolution to that effect, or by subsequent ratification, or by acquiescence in transactions of a similar nature, of which the directors have notice.

3. SAME—ACCOMMODATION INDORSEMENT.

An English mortgage company, by its resident directors, E. & C., made a draft on its home office in London for £5,000, payable to the order of the resident manager, and applied it to the Bank of Commerce to cash the same. The bank agreed to cash it if the indorsement of the First National Bank was obtained. The cashier of the latter bank indorsed the draft. The draft, less discount, was credited by the Bank of Commerce to the First National Bank, and a credit to the mortgage company was made on the books of the First National Bank. A similar draft for £3,000, was negotiated in the same manner. Both of these drafts were paid. A second draft for £5,000 was drawn, and was indorsed by the cashier of the First National Bank in the same manner, but no entry of the draft or of the indorsement was made in the books of the bank. This draft was taken by one of the officers of the mortgage company to the Bank of Commerce. A second draft for £3,000 was also drawn and indorsed by the cashier, and delivered to the Bank of Commerce. The London office refused to pay the draft, as drawn without authority. On receipt or notice of refusal to pay the second draft for £5,000 the Bank of Commerce notified the officers of the mortgage company that it had been protested. It called on that bank, and, being informed that the draft must be taken up, gave a note for the amount. E. was chairman of the resident board of directors and also president of the First National Bank. The note was drawn up in the office of the Bank of Commerce, and signed by the mortgage company by E., chairman, and indorsed by him as an individual, and also by the First National Bank by E., as president. The note was executed and indorsed by him without the knowledge of the other officers of the First National Bank, and without authority from it. When the second draft for £3,000 was returned, a similar note was given for it. These notes were renewed at maturity in a single note, which was further renewed. All the notes were executed and indorsed as the first note had been. *Held* that, under the circumstances, and upon the evidence, the First National Bank was not liable, having never received any consideration for the indorsement, which was only an accommodation indorsement, made by the president without authority.

At Law. Action by the National Bank of Commerce of Kansas City, Mo., against W. T. Atkinson, receiver of the First National Bank of Kansas City, Kan., upon certain promissory notes and a certificate of deposit.

Elijah Robinson, for plaintiff.
Ady, Peters & Nicholson, for defendant.

RINER, District Judge. This is an action at law. The petition contains four separate causes of action. The first cause of action is upon a promissory note for the sum of $38,959, with interest,

dated at Kansas City, Mo., October 22, 1890. The second cause of action is upon a promissory note for the sum of $7,500, with interest, dated at Kansas City, Mo., October 20, 1890. The third cause of action is upon a promissory note for the sum of $5,000, dated at Kansas City, Mo., July 11, 1891. The fourth cause of action is upon a certificate of deposit for the sum of $15,000, dated at Kansas City, Kan., April 28, 1891. The notes described in the first and second causes of action are signed by the English & American Mortgage Company, Limited, by Eli H. Chandler and D. R. Emmons, directors, and indorsed by Eli H. Chandler, D. R. Emmons, and the First National Bank of Kansas City, Kan., by D. R. Emmons, president. The note described in the third cause of action is signed by the First National Bank of Kansas City, Kan., by I. D. Wilson, president, and indorsed by I. D. Wilson and Benjamin Schnierle. The certificate of deposit described in the fourth cause of action was issued by the First National Bank of Kansas City, Kan., and signed by Benjamin Schnierle, cashier, and payable to L. D. Wilson, and, before maturity, was by him indorsed, sold, and transferred for value to the plaintiff, who is now the legal owner and holder thereof. The real controversy in the case relates to the first and second causes of action, the defendant admitting the execution of the note and certificate of deposit set up in the third and fourth causes of action, insisting merely that the collaterals deposited therewith shall be returned, or it be credited therewith, before the claim can be audited and allowed as a claim against the bank. The facts shown by the record, so far as they relate to the first and second causes of action set up in the petition, are as follows: On August 3, 1889, the English & American Mortgage Company, a corporation, with headquarters at London, Eng., and a branch office at Kansas City, Kan., through D. R. Emmons, the chairman of its board of directors, and Eli H. Chandler, a director and the manager of the mortgage company, applied to the plaintiff, the National Bank of Commerce of Kansas City, Mo., to cash a draft upon the London office for £5,000 sterling. The draft was drawn by Emmons and Chandler, the directors of the English & American Mortgage Company, Limited, payable to the order of Eli H. Chandler, manager. At the time they applied to have this draft cashed they were informed by the officers of the Bank of Commerce that if they would obtain the indorsement of the First National Bank of Kansas City, Kan., upon the draft the same would be discounted, and the draft was thereupon taken to William Albright, cashier of the First National Bank of Kansas City, Kan., who, after the same had been indorsed by Eli H. Chandler, manager, indorsed upon the back of the draft the following words: "Pay to the order of the National Bank of Commerce, Kansas City, Mo., for account of First National Bank of Kansas City, Kansas. William Albright, Cashier." Chandler then took the draft, and returned to Kansas City, Mo., and delivered the draft so indorsed to the National Bank of Commerce, and was informed by the officers of that bank that he could now have the money. Thereupon the amount of the draft, less the discount charged by the National Bank of Commerce, was credited to the First National

Bank of Kansas City, Kan., for account of the English & American Mortgage Company, and a memorandum of the account given to Chandler, who then returned to Kansas City, Kan., and gave the memorandum to the cashier of the First National Bank of Kansas City, Kan., and the amount was entered upon the books of the First National Bank as a remittance to the National Bank of Commerce. The draft, after being delivered to the National Bank of Commerce by Chandler, was indorsed by that bank to Brown Bros. & Co., of New York city, and by Brown Bros. & Co. was indorsed to the London & Westminster Bank, and forwarded to London, and was presented to the London office of the English & American Mortgage Company, and was accepted. The acceptance, which is written upon the face of the draft, is in the following words: "Accepted. Payable at the Capital and County's Bank, L. D. The English and American Mortgage Co., Limited. M. M. Moore, S. H. Green, Directors. George W. Dawson, Secretary." On the 13th of August 1889, a draft for £3,000 sterling was drawn by Eli H. Chandler and Edmund T. Brown, directors of the English & American Mortgage Company, Limited, payable to the order of Eli H. Chandler, manager, upon which draft the same indorsement was made by William Albright, cashier of the First National Bank of Kansas City, Kan., as was made upon the first draft for £5,000 sterling. This draft also was taken by Chandler to the National Bank of Commerce, and the amount, less the discount, was credited up to the First National Bank of Kansas City, Kan., and by the Bank of Commerce indorsed as follows: "Pay Kountze Bros. or order, account National Bank of Commerce, Kansas City, Mo. H. C. Switzgable, A. C." This draft was forwarded to London, presented at the office of the English & American Mortgage Company, Limited, at that place, and accepted. The acceptance, written across the face of the draft, is as follows: "Accepted. Payable at the Capital and County's Bank, L. D. Threadneedle St., London, England, August 28, 1889. M. M. Moore, S. H. Green, Directors. George W. Dawson, Secretary." This transaction was entered upon the books of the First National Bank of Kansas City, Kan., as a remittance to the National Bank of Commerce, taking the same course which had been taken with the first £5,000 draft.

The amount entered upon the books of the First National Bank of Kansas City, Kan., as the credit given by the National Bank of Commerce to the first draft, dated August 3d, was the sum of $24,030, which was all the money the English & American Mortgage Company had to its credit on that day in the First National Bank of Kansas City, Kan. August 4th the mortgage company checked out $5,514.03; August 6th, $931.88; August 7th, $1,040.50; August 8th, $2,509.59; August 9th, $2,004; and August 10th, $2,924.02,—making a total checked out by the mortgage company from the 4th to the 10th day of August, inclusive, of $23,823.99. August 13th the amount to the credit of the mortgage company in the First National Bank of Kansas City, Kan., after having received the credit from the Bank of Commerce for the £3,000 draft, was $14,396. On that day the mortgage company checked out $1,326.85; August

14th, $1,977.37; August 15th, $3,790; August 16th, $3,377.95; August 17th, $1,108.42; August 19th, $2,988.61; August 20th, $534; August 21st, $1,185.25; and August 22d, $641.66,—making a total checked out from the 13th to the 22d of August, inclusive, of $16,234.35. October 1, 1889, D. R. Emmons and Eli H. Chandler, directors of the English & American Mortgage Company, drew a draft for £5,000 sterling, payable to the order of Eli ·H. Chandler, upon the English & American Mortgage Company, Limited, 6 Lombard St., London, which draft was indorsed by Chandler, and also by William Albright, cashier of the First National Bank of Kansas City, Kan., and delivered to the Bank of Commerce, and by that bank sent to Kountze Bros., and by them forwarded to the Union Bank of London. . This draft was taken by one of the officers of the mortgage company to the National Bank of Commerce, the officer of the mortgage company who delivered the draft having first obtained the indorsement of the cashier of the First National Bank of Kansas City, Kan., but no entry of this draft or the action of the cashier was ever made upon the books of the First National Bank of Kansas City, Kan. This draft was protested on the 3d of December, 1889, at the request of the Union Bank of London. The protest shows that it was presented at the office of the mortgage company in London, and payment demanded. That payment was refused, the refusal being in the following words: "Refused to pay. Drawn without authority." October 11, 1889, D. R. Emmons and Eli H. Chandler, directors of the English & American Mortgage Company, London, drew a draft for £3,000 sterling, payable to the order of Eli H. Chandler, manager, drawn upon the English & American Mortgage Company, Limited, which draft was also indorsed by Chandler and by William Albright, cashier of the First National Bank of Kansas City, Kan., and delivered to the National Bank of Commerce, and by that bank forwarded through its New York correspondent to London. It was presented for payment at the office of the mortgage company in London on the 13th of December, and payment refused. The refusal indorsed upon the draft is as follows: "No authority to draw. No orders. George W. Dawson, Secretary." And upon the same day the draft was protested for nonpayment. December 9th the National Bank of Commerce, having received notice of the protest of the second draft for £5,000 sterling, dated October 1, 1889, notified the officers of the mortgage company that the draft had been protested. Chandler, in whose favor the draft had been drawn, was absent, and Emmons, the chairman of the board of directors of the mortgage company, upon receiving notice, called at the office of the National Bank of Commerce of Kansas City, Mo., where he was informed that the draft must be taken up. At this time the mortgage company was indebted to the Bank of Commerce, on a previous loan, in the sum of $5,000, and Emmons, chairman of the board of directors of the mortgage company, was indebted to the Bank of Commerce, on his individual account, in the sum of $5,000. Emmons, not being able to take up the draft, thereupon gave a note for the sum of $34,334. This note was drawn up in the office of ·the Bank of

Commerce, and signed by the English & American Mortgage Company, Limited, by Emmons, chairman, and indorsed by him as an individual, and also by the First National Bank of Kansas City, Kan., by Emmons, as president.   This note was executed and indorsed by Emmons without the knowledge of any of the officers of the First National Bank of Kansas City, Kan., except Emmons, and without any authority from that bank.   This note became due on the 13th of January, 1890, at which time the interest was paid, and the note extended to January 25th, and on the 4th of February, 1890, was stamped on the face thereof "Paid" by the Bank of Commerce.   After the second draft for £3,000 sterling, dated October 11, 1889, and protested December 13, 1889, had been returned to the Bank of Commerce, the mortgage company was notified of the same by the bank, and the officers of the mortgage company then gave the note of the company for $14,611.   Some time in the latter part of January or the first part of February, 1890, the officers of the mortgage company gave a note to the Bank of Commerce for the sum of $48,959, which note was a renewal of the $34,347 note and of the $14,611 note; the two last-mentioned notes being included in one note.   The note for $48,959 was renewed April 17, 1890, and again on May 5th, for the same amount.   June 7th this note was taken up, and two renewal notes given in lieu thereof,—one for $39,959, and one for $8,500; a payment of $1,500 having been made by the mortgage company on that date.   Subsequently another payment of $1,000 was made and applied upon the note for $8,500.   July 10, 1890, a renewal note for the sum of $38,959, and another for the sum of $7,500, due in 30 days, were executed. These notes were again renewed September 19, 1890.   The two notes last mentioned are the notes described in the first and second causes of action for which suit was brought.   These notes were all executed by the officers of the mortgage company, in the office of the Bank of Commerce of Kansas City, Mo., and indorsed by Emmons and Chandler as individuals and by the First National Bank of Kansas City, Kan., by D. R. Emmons, president.   The only connection that the First National Bank of Kansas City, Kan., had with any of the notes was that of Emmons, who was president of the First National Bank of Kansas City, Kan., and also chairman of the board of directors of the English & American Mortgage Company.   None of the transactions in relation to the second series of drafts or any of these notes appear upon the books of the First National Bank of Kansas City, Kan., nor did any of the officers or directors of the First National Bank of Kansas City, Kan., except Emmons, the president, know of the existence or giving of the notes or any renewals thereof.   The First National Bank of Kansas City, Kan., received no interest or discount upon the first series of drafts, or any benefit therefrom, unless the fact that the first draft, credited to it on the 4th of August, 1889, and checked out between that date and the 10th of August, 1889, and the second draft, credited to it August 13, 1889, and all checked out between that date and the 22d of August, 1889, can be considered a benefit.   When the second series of drafts were returned, the National Bank of Com-

merce demanded of the mortgage company collaterals, which were delivered to it, and which were mortgages upon various properties, and amounting in the aggregate, upon their face, to the sum of $24,283.50.

December 9, 1889,—at the time the note for $34,347.50 was given, —the First National Bank of Kansas City, Kan., had a credit on the books of the National Bank of Commerce of Kansas City, Mo., of $97,898.64; on December 7, 1889, they had a credit of $35,403.93; on the 10th of December, 1889, $103,226.83; on the 11th day of December, 1889, $73,894.33; on the 12th day of December, 1889, $38,311; on the 14th of December, 1889, $43,293.51; on the 17th of December, 1889, $41,495.54; on the 18th of December, 1889, $121,-549.27; on the 19th of December, 1889, $123,565.76; on the 20th of December, 1889, $93,586.93; on January 1, 1890, $62,174.35; on January 18, 1890, $69,613; on January 20, 1890, $70,004.67; on January 21, 1890, $64,792.95; on January 23, 1890, $64,502.28; on January 24, 1890, $56,521.91. The First National had borrowed money of the National Bank of Commerce on the 8th of January, 1889, when it secured a loan of $100,000. On the 2d of February, 1889, it secured two loans of $5,000 each. On the 11th of February, 1889, the amount remaining due of the first $100,000 loan, to wit, $73,000, was evidenced by a renewal note. On March 16, 1889, two loans were obtained from the Bank of Commerce, one for $5,000 and one for $10,000. On April 6, 1889, another loan was obtained for $5,000. On April 18, 1889, two notes were given for $25,000 each. These were renewals of what remained of the first $100,000 loan. The First National Bank of Kansas City had, as shown by the evidence, prior to the 3d day of August, 1889, nine different transactions in regard to loans and renewals of loans obtained by it from the National Bank of Commerce. At least five of these nine transactions were renewals of former loans. Whenever a loan was secured from the National Bank of Commerce by the First National Bank of Kansas City, Kan., its officers were required to put up as collateral to secure such loans an equal amount of commercial paper. The capital stock of the First National at the time these loans were obtained from the National Bank of Commerce was $100,000. The banking house of the First National Bank of Kansas City, Kan., is distant about two miles from the banking house of the National Bank of Commerce in Kansas City, Mo. When the loan of $100,000 was obtained from the National Bank of Commerce it was obtained by D. R. Emmons, as president of the First National of Kansas City, and William Albright, as cashier, and it was necessary and urgent that the loan be obtained at once; that said loan was obtained without authority from the board of directors, but was afterwards ratified by the board of directors of the First National Bank by resolution. D. R. Emmons was the vice president for a portion of the year 1889, and president for the remaining portion of 1889, and during the year 1890, and up to February, 1891. William Albright was the cashier during 1889 and 1890 and up to February, 1891. I. D. Wilson and Benjamin Schnierle were president and cashier, respectively, from February, 1891, until

July 16, 1891, when the First National of Kansas City, Kan., closed its doors and passed into the hands of the comptroller of the currency.    D. R. Emmons was indebted in a large sum as an individual to the National Bank of Commerce of Kansas City, Mo., and had prior to February, 1891, deposited as collateral with said National Bank of Commerce of Kansas City, Mo., $20,000 worth of his stock in the First National Bank of Kansas City, Kan.    At the time he ceased to be president, in February, 1891, or a short time prior thereto, this $20,000 of stock was sold and transferred to I. D. Wilson.    Eli H. Chandler, the manager of the English & American Mortgage Company, Limited, had no interest whatever, either as stockholder or officer, or in any other manner, in the First National Bank of Kansas City, Kan., and had no connection with it

For convenience I will first dispose of the second cause of action. I think the defendant has established by a clear preponderance of the evidence that this note was given to the Bank of Commerce for the personal indebtedness of the English & American Mortgage Company and D. R. Emmons.    The testimony shows that the mortgage company was indebted to the Bank of Commerce in the sum of $5,000, and that Emmons was also indebted to the Bank of Commerce in the sum of $5,000; that this indebtedness of Emmons and the mortgage company was, at the request of the Bank of Commerce, included originally in one note for $10,000; that subsequently there was paid at one time $1,500; at another time $1,000; that one renewal was taken for $8,500 and another for $7,500, which is the note described in the second cause of action.    This being an indebtedness with which the First National Bank had nothing whatever to do, and no interest in, it is clear that the plaintiff is not entitled to recover upon the second cause of action.

As to the first cause of action, I think the testimony shows beyond all question that the note, therein described, represents the two drafts of £5,000 and £3,000 respectively, and that the slight difference between the note and the aggregate of the two drafts must be due to the fact that it was for unpaid interest, and included in the note. It is contended by the plaintiff that the National Bank of Commerce rediscounted these drafts for the First National Bank, and placed the money to the credit of that bank; in other words, that it loaned money to the First National Bank to discount the drafts, and that the Bank of Commerce then rediscounted them, and forwarded them for collection.    The defendant contends—First. That Albright had no authority to place the indorsement of the First National Bank upon these drafts, or either of them, and that Emmons, the president, had no authority whatever to place the indorsement of the First National Bank upon the first note, which was given after the drafts were protested, or any note representing these drafts. Second. That the indorsement, at most, was a loaning of the bank's credit, or, in other words, an accommodation indorsement, which the bank had no power to make.    There is no doubt but what the law is that a national bank cannot loan its credit or become an accommodation indorser.    On that question the decisions are uniform.    It is also true that the president of a bank has no power inherent in

his office to bind the bank by the execution of a note in its name, yet the power to do so may be conferred upon him by the board of directors, either expressly, by resolution to that effect, by subsequent ratification, or by acquiescence in transactions of a similar nature, and of which the directors have knowledge. In other words, I think it must be held that banks are liable for the acts of their officers, especially executive officers and general agents, within the general scope and apparent sphere of their duties; but that they are not liable for the acts of their officers done without special authority, in cases which are not within the general scope and sphere of their duties as such officers. The responsibility of a bank (in the absence of express authority to do a particular act) is limited to the acts of its officers and agents, performed in the discharge of their ordinary duties in the usual course of business and within the sphere and scope of such duties. Acts within the ordinary sphere and scope of their business are presumed to be by authority, and within the knowledge of the directors. That there was no express authority given by the board of directors, by resolution or otherwise, either to Albright, the cashier, or to Emmons, the president, to indorse the drafts and notes is conceded. Neither was there any formal ratification of their action by the directors or officers of the bank. Indeed, none of them had any knowledge whatever of the transactions except Emmons and Albright. This brings us to the inquiry, did the bank retain and enjoy the proceeds of these transactions, and thereby become liable, by reason of its indorsement appearing upon these papers? The testimony shows that Emmons and Chandler, chairman and manager, respectively, of the English & American Mortgage Company, first applied to the Bank of Commerce, the plaintiff, to discount or cash the £5,000 draft, which the bank at first declined to do, but subsequently did after the indorsement of the First National Bank had been obtained. As to the arrangement made between Dr. Woods, the president of the Bank of Commerce, and Emmons and Chandler, representatives of the mortgage company, at the time of the application to cash the first draft, the testimony is conflicting. Dr. Woods' testimony is to the effect that he declined to discount the drafts for the mortgage company, but stated that he would do so for the First National Bank, for the reason that that bank was a customer of the Bank of Commerce; while both Emmons and Chandler swear positively that Dr. Woods stated that he would discount the draft if they would procure the indorsement of the First National Bank. They further testify that thereupon they returned to Kansas City, Kan.; that Emmons took the draft, handed it to Albright, the cashier, and requested him to place the indorsement of the bank upon it, which he did; that thereupon Emmons gave the draft to Chandler, who returned to Kansas City, Mo., and delivered it to the Bank of Commerce. As to the conversation which took place between Chandler and the officers of the Bank of Commerce when he returned the draft the testimony is also conflicting, he stating that the officer of the bank with whom he did the business (which was either Mr. White or Switzgable) asked him if he wanted the money, and that he stated to them that he did not, but

that the money should be placed to the credit of the First National Bank for the account of the mortgage company, which was done; but Mr. White and Mr. Switzgable deny that they asked Mr. Chandler if he wanted the money, and state that they placed the money to the credit of the First National Bank without inquiry. Be this as it may, the fact is, as shown by the record, that the money was placed to the credit of the First National Bank for account of the English & American Mortgage Company. Mr. Albright's testimony tends to corroborate the testimony of Emmons and Chandler that the only thing required by the Bank of Commerce was the indorsement of the First National Bank. He states that when the drafts were presented to him with the request that he place the indorsement of the bank upon them he asked the person presenting the drafts, "Where are you going to get the money?" and that he replied that he could get it at the National Bank of Commerce, provided he could get the indorsement of the First National Bank of Kansas City, Kan., on them, and that he, Albright, then indorsed them. In his cross-examination he says:

"I am not positive about the second draft,—that is, referring to the draft for $5,000 as being the last draft. Those drafts, and especially the first one, were brought in, and I was asked to sign it, upon the statement that the National Bank of Commerce would take them if the First National would indorse them."

It is shown by the record beyond all question that the First National Bank never received any benefit whatever by way of discount or otherwise out of the transaction in relation to these drafts, or either of them. While counsel for the plaintiff, in his brief, refers constantly to the discount by the Bank of Commerce as a rediscount, yet there is not a scintilla of evidence tending to show any rediscount. On the other hand, the evidence shows that the only discount upon these drafts was the discount made by the Bank of Commerce after the drafts had been returned to it by Emmons and Chandler with the indorsement of the First National Bank upon them, and that they placed the full amount, less the discount charged by them, to the credit of the First National Bank for account of the English & American Mortgage Company, and that it was all checked out by that company within a very few days after being so credited. To strengthen the position of Dr. Woods that he did not ask Emmons and Chandler to get the indorsement of the First National Bank, but, on the contrary, said that he stated that he would give the accommodation to the First National Bank, his counsel asked him the following questions:

"Question. You were in business before you were connected with the National Bank of Commerce? Answer. Yes, sir. Q. You knew whether a national bank was authorized to loan its credit to any one else? A. I had a taste of it once in a lawsuit, and I know they can't do it."

Dr. Woods' answer is very skillful, but his knowledge of the law, as it seems to me, does not tend to strengthen his testimony. His answer is that he once had a taste of it in a lawsuit, and he knew they could not do it, but he wholly fails to state whether the lawsuit to which he refers occurred before or after the time these drafts

were given; and the effect of the last part of his answer is that at the time he was testifying he knew they could not do it. He does not say what knowledge he had upon the question when these drafts were drawn in 1889. The evidence shows also that Dr. Woods was quite familiar with the business of the First National Bank and of Mr. Emmons, its president, and he must have known that the business in relation to these drafts was not conducted in the usual course between his bank and the First National. The record shows that prior to that time there had been nine transactions or loans made to the First National Bank by the Bank of Commerce, five of which were renewals; that in every instance when the Bank of Commerce loaned money to the First National Bank it required collateral to the amount of the loan. Nothing of that sort was required at the time these drafts were cashed. The indorsement of the First National Bank was procured at his suggestion. The First National Bank never received any benefit from discounts or otherwise on these drafts. The renewal drafts and the notes were not placed upon the books of the First National Bank. When the drafts were protested the First National Bank was not notified of the protest, but, on the contrary, the mortgage company only received notice of their dishonor. The notes were all indorsed in the office of the Bank of Commerce by Emmons, president, and away from the place of business of the First National, and no mention of them was made upon its books. The directors of the bank did not know of their existence, and could not have ascertained their existence from an examination of the books or accounts of the bank. Such a transaction, it seems to me, cannot be said to be in the usual course of business, or within the implied powers of the president of a bank. My attention is especially called to the case of People's Bank v. National Bank, 101 U. S. 181. That was a case upon a guaranty. The papers passed through the bank in the regular course of business. The bank received the benefit of the transaction, and the officer of the bank was acting strictly within the scope of his authority as an officer of the bank. The facts in that case are different from the facts in the case at bar, and the decision, in my judgment, does not aid the plaintiff.

The Exchange Bank of Kansas City, Kan., was consolidated with the First National Bank of Kansas City, Kan., in February, 1891. I allude to this fact for one purpose only. The evidence shows that Dr. Woods took an active part in bringing about this consolidation; and Mr. Wilson states that Dr. Woods said to him prior to the consolidation that the First National owed the Bank of Commerce $15,000, and that the Exchange Bank, with which Mr. Wilson was connected, owed its correspondent $15,000, and that that would put the banks upon an equal footing, so far as indebtedness was concerned. Dr. Woods most emphatically denies that he ever made such a statement, but admits that he did not inform Mr. Wilson of this indebtedness of the First National on these notes arising through this draft transaction, for the reason, as he states: "I wasn't making Mr. Wilson's side of the trade at all. I am free to say that I thought the consolidation would strengthen the bank, and possibly protect

our debt." Mr. Emmons testifies that at the time of the consolidation Dr. Woods requested him not to mention this indebtedness to Mr. Wilson. This statement is also denied by Dr. Woods, but the fact remains that here was a note of $38,000, the existence of which was not shown by the books of the First National Bank, or known to any of its directors. It was only known to the officers of the Bank of Commerce and Emmons. And the question now is, can the plaintiff, under all the circumstances of this case, compel the stockholders of this bank to go down in their pockets and raise the funds necessary to liquidate this indebtedness, for which the bank never received one cent of benefit? My own view is that it cannot. The transaction, so far as the First National Bank is concerned, was a loaning of its credit, and the indorsement an accommodation indorsement, which it had no right to give. In indorsing the name of the bank on the drafts Albright exceeded his authority as cashier, and in indorsing the name of the bank upon these notes Emmons, as president of the bank, was not acting within the general scope and sphere of his duties as president of the bank; that he had no authority, either express or implied, to make the indorsement, and the bank is not liable.

As to the third and fourth causes of action, plaintiff is entitled to recover the amount claimed, less the amount which it has collected upon the collateral held by it, after deducting the costs of collection.

A judgment will be entered in favor of the defendant upon the first and second causes of action, and in favor of the plaintiff upon the third and fourth causes of action, subject to the credit above mentioned. Each side will be allowed 60 days to prepare and present a bill of exceptions for allowance.