In Equity.

GEORGE W. JOHNSON vs. JOHNSON BROTHERS.

Sagadahoc.    Opinion July 14, 1911.

*Corporations. Franchise Tax. Treasurer. Findings. Accommodation. Indorse-
ment. Consideration. Accommodation Paper. Ultra Vires. Bills and Notes.
Innocent Holders. Evidence. Revised Statutes, chapter 8, sections 18-22 ;
chapter 47, section 26.*

Assessment of a franchise tax against a corporation under Revised Statutes,
chapter 8, sections 18-22, after appointment of receivers in proceedings to
dissolve the corporation and while such proceedings are pending, does not
create a debt provable against the corporation.

The treasurer of a corporation is presumed to have had authority to use the
corporate name on notes for the benefit of another corporation or himself,
where the other directors who constituted the remaining stockholders,
knew that he had followed such practice for several years and did not
object.

The finding of receivers acting as masters under order of court is entitled to
the weight of a verdict, and is not to be set aside or reversed unless the
evidence reported shows the finding to be clearly wrong.

That a defendant corporation was a large creditor of another company does
not show such interest as to constitute a valid consideration for defend-
ant's indorsement of the company's paper.

Where a corporation, having taken over the assets and assumed the liabili-
ties of a partnership, substitutes its name for that of the partnership in the
renewal of a note on which the partnership was liable as an accommodation
party, its act in so doing is not without consideration.

Unless a corporation be specially authorized to do so, the execution or
  indorsement of accommodation paper merely for the benefit of third
  persons is an act beyond the scope of its corporate authority.

A private corporation organized for pecuniary profit may borrow money
  when necessary and issue customary evidences of debt therefor, unless
  prohibited by its charter.

The title of the holder before maturity of accommodation paper used by a
  corporation can be defeated only by proof that he took it knowing that it
  was accommodation paper, or under such facts and circumstances that he
  is chargeable with notice of that fact.

Evidence *held* to show that notes were indorsed on the part of a corporation
  for the benefit of another.

Evidence *held* to show that the payees of notes took them with knowledge
  that they were indorsed by a corporation for accommodation.

In equity. On report. Decree according to opinion.

Bill in equity against the defendant, an insolvent corporation, to
wind up its affairs and distribute its assets among its creditors.
Reported to the Law Court for determination.

The case is stated in the opinion.

NOTE. See *Johnson* v. *Monson Consolidated Slate Co.*, post.

*Frank L. Staples*, for Receivers.

*Arthur J. Dunton*, for First, Marine and Lincoln National Banks.

*Stearns & Stearns*, for Bacon-Robinson Co.

*Charles P. Barnes*, Assistant Attorney General, for the State.

SITTING: EMERY, C. J., WHITEHOUSE, SAVAGE, SPEAR, KING,
  BIRD, JJ.

KING, J. This is a proceeding in equity against the defendant,
an insolvent corporation, to wind up its affairs and distribute its
assets amongst its creditors. Receivers of the corporation were
appointed, who, acting by order of the court to take proof of claims
against the corporation, made report of their doings in which they
specified all claims presented, showing a total indebtedness claimed
of $94,111.89, of which they recommended that the following
should be disallowed :

| | |
|---|---|
| State of Maine | $ 10.00 |
| Marine National Bank (one half) | 850.00 |
| do | 1500.00 |
| do | 10000.00 |
| Lincoln National Bank | 1200.00 |
| do | 1750.00 |
| do | 700.00 |
| do | 850.00 |
| do | 900.00 |
| First National Bank | 450.00 |
| do | 2800.00 |
| do | 850.00 |
| do | 800.00 |
| do | 450.00 |
| Bacon & Robinson Co. | 300.00 |
| do | 400.00 |
| Mrs. Henry C. Tarbox | 2950.00 |
| Edward W. Hyde total | 9451.57 |

The report of the receivers as to all claims presented (except those recommended by them to be disallowed as above) has been accepted, and Mrs. Henry C. Tarbox and Edward W. Hyde do not now contest the disallowance of their claims. As to all the other claims above enumerated the case is reported to this court upon statements of facts agreed to by the receivers and the various creditors presenting said claims, the Law Court to render such decision respecting each claim as the law and the evidence require. The report of the receivers (acting as masters under direction of the court) is made a part of the case.

In determining whether or not the claims here involved should be disallowed, it is to be borne in mind at the outset, that the affairs of the corporation are now in the hands of the receivers as officers of the court, and that the controversy is not one between the corporation and these claimants, but one between them and the other creditors of the corporation.

## CLAIM OF THE STATE OF MAINE.

This claim is for a franchise tax of $10 assessed against the corporation under the provisions of chapter 8, R. S., secs. 18-22. Section 19 provides, that the State Assessors shall, on or before the first day of July, annually, assess a franchise tax upon the authorized capital stock of the corporation, and the tax shall become due and payable on the first day of September thereafter. Every corporation subject to a franchise tax is required to make a return to the Secretary of State, on or before the first day of June, annually, of the amount of its authorized capital stock, as the basis of the assessment of the franchise tax. Chap. 47, R. S., sec. 26. Such tax "shall be a debt due from such corporation to the State," which shall also be "a preferred debt in case of insolvency under the laws of this State, or in any process of liquidation in its courts." Sec. 20, c. 8, supra.

This so called tax is not levied on property, but is imposed on the corporation in the nature of an annual license fee for the right to continue to exercise the privileges conferred upon it by the State. It is plain that under the provisions of our statute a franchise tax is assessable against a corporation only as of the first day of July annually, and covers the period of the succeeding year. And the franchise tax in question was assessed against the defendant corporation as of July 1st, 1910, and for the year beginning on that date. But the defendant corporation had passed into the hands of receivers by order of court made in April, 1910, under proceedings for its dissolution. The defendant thereafter had no right to exercise for itself any of the privileges conferred upon it by the State. Its franchise—its right to do business for itself—had ceased, and the State had taken possession of its assets for distribution among its then existing creditors. No claim can share in those assets unless it was an outstanding debt against the corporation at the date of the decree of sequestration. The tax in question was not such a debt. It did not exist at that time, and under the statute which authorized it, could not have existed prior to July 1, 1910. Moreover, at the time this tax was assessed there was no

basis for its assessment, because the corporation then had no franchise or privilege to do business, without which, manifestly, no franchise tax could be imposed. *Jones* v. *Winthrop Savings Bank*, 66 Maine, 242. Our conclusion, therefore, is that the State has no valid claim against the defendant corporation for this tax.

The several claims herein above specified as presented by the three banks arise upon negotiable promissory notes, and it is contended in support of the recommendation that they be disallowed, (1) that the name of the defendant corporation was put upon the notes without authority of the corporation, (2) that it was done for the accommodation of another corporation or person, an act entirely outside of the scope of the powers conferred upon the corporation, and therefore, ultra vires and void, and (3) that the banks took the notes, either having actual knowledge that the defendant was an accommodation party thereto, or charged with notice of that fact. Each of these contentions is sharply controverted.

In deciding the questions thus presented in respect to these notes, it becomes necessary to consider the business relations of the parties thereto, and the manner and circumstances in which the notes were issued.

The notes in question are made payable to the respective banks. The name of Johnson Brothers appears on the back of all but two, and another name, in most instances that of the Monson Consolidated Slate Company appearing on the face of the notes as maker. Johnson Brothers was originally a partnership consisting of three members, George W. Johnson, Edward F. Johnson, and Ernest A. Johnson. This firm carried on a hardware and ship chandlery business in Bath. January 12, 1895, George W. Johnson became treasurer of the Monson Consolidated Slate Company, a Maine corporation operating a slate quarry at Monson, Maine. Subsequently Ernest A. Johnson also became a stockholder in the Monson Company, but Edward F. Johnson, the other partner, was never a stockholder therein. The partnership name was signed by George W. Johnson, who was the financial manager of the firm, with the tacit consent of all the members, "on his personal notes and notes

in connection with the business of Johnson Brothers and the Monson Company." Some of the notes in question, as will be hereafter noted, are renewals, or include renewals, in whole or in part, of notes to which the name of Johnson Brothers was signed while the partnership continued. After this practice of signing notes in the partnership name for the Monson Company and for George W. Johnson had continued for a time the three partners, on May 22, 1896, formed a corporation under the general law of Maine to take over and carry on the partnership business, keeping the same name, and they have been its only stockholders and officers since its incorporation. The purposes of the corporation, as expressed in its Articles of Association, were the "carrying on the business of ship chandlery, hardware including anchors, chains and all outfittings of vessels, painters' supplies and farming utensils, the acquiring owning and managing ship property, and the purchasing, owning and selling real estate." The corporation took over the assets and assumed the liabilities of the partnership. After the incorporation of Johnson Brothers the same practice of signing notes for the Monson Company and for George W. Johnson was continued, the corporation taking the place of the partnership on renewals of notes previously discounted at the banks, and various additional notes, made in the same manner, were discounted at the banks. The corporate name of Johnson Brothers was put upon the notes, before they were negotiated, by George W. Johnson its treasurer, but there is no evidence by any formal vote of the directors or stockholders authorizing or ratifying it. It is agreed, however, that Edward F. and Ernest A. Johnson, the other directors and stockholders, had general knowledge that the treasurer, to whom the financial management of the corporation was wholly left, had been signing notes in the corporate name "for the benefit of the Monson Co. with greater or less frequency since August 13, 1895." It is also agreed that, "since its incorporation Johnson Brothers had, at times, paid with its checks various bills of the Monson Company for supplies and merchandise sold direct to that company; had occasionally bought large orders of merchandise for it; had sold to it in the regular course of business

frequent bills of goods; had occasionally paid interest on that company's notes at the various banks, and had transferred from its own account at the different banks from time to time various sums of money, as loans, to the Monson Company, charging all these items up against that company.

It had also occasionally, and as late as April 4, 1910, deposited to its own account checks drawn to the order of the Monson Company, giving that company credit for the same on its (Johnson Brothers) books. At the time of the appointment of the receivers there was due Johnson Brothers on this account, including interest, $84,239.79, in addition to which notes had been given by the Monson Company to Johnson Brothers to the amount of $5,850, which still remain unpaid." George W. Johnson and Ernest A. Johnson, individually, acquired a controlling interest in the capital stock of the Monson Company, and the corporation of Johnson Brothers owned bonds of the Monson Company to the amount of $10,000. Neither of the banks made any inquiry as to whether by its charter, by-laws, or votes of the stockholders or directors, Johnson Brothers had authority to sign notes for the Monson Company; but all were informed that Johnson Brothers was incorporated to take over and carry on in corporate form the business of the partnership, and that the individual brothers who composed the partnership were the only stockholders and officers of the corporation of Johnson Brothers.

The foregoing states substantially all the facts and circumstances, as disclosed in the general agreed statement, applicable to each and all the notes as a class, but the parties have also made special agreed statements as to the history of each note, which will be hereinafter referred to in considering each note separately.

1. Was the treasurer authorized by the board of directors to use the corporate name upon the notes in question?

The corporation of Johnson Brothers consisted of three brothers. It was organized to take over and carry on their partnership business. They were its only stockholders and directors. It is agreed that the other two directors had left the financial management of the corporation "wholly with the Treasurer, George W. Johnson."

The by-laws provided that the Treasurer "shall sign all checks, notes, and negotiable papers in the name of the Company and as Treasurer thereof." And it is further agreed that the other two directors had general knowledge that the treasurer had been signing the corporate name to "notes for the benefit of the Monson Co. with greater or less frequency since August 13, 1895," a period of about fifteen years.

In the recent case of *York* v. *Mathis*, 103 Maine, 67, 69, this court said that "it is entirely competent for a board of directors to establish a mutual understanding that one of their number shall be the active agent of the board in the management of the property and the conduct of the business affairs of the corporation. It is not necessary that such an understanding should be created by a formal vote passed at a formal meeting or proved by a formal record. It may be inferred from the situation and conduct of the parties. A director may acquire the power to bind the corporation by the habit of acting with the assent and acquiescence of the board, and so his unauthorized acts may be confirmed by the approbation and acquiescence of the board. It is true that in either case it is the board that acts or acquiesces, and not the directors as individuals, but subsequent ratification as well as previous authority or acquiescence may be shown by circumstances and conduct." See also *Blake* v. *Domestic Manufacturing Co.*, 64 N. J. Eq. 480, 38 Atl. 241, a case of marked similarity to the one at bar with respect to the questions involved, and in which this precise point is exhaustively considered.

It appears that prior to the incorporation of Johnson Brothers, George W. Johnson used the partnership name, with the assent of his co-partners, on notes for the benefit of the Monson Co. and himself. As treasurer of the corporation of Johnson Brothers he continued to do the same for many years. The other two directors had knowledge that he was so using the corporate name and made no objection. From these facts and circumstances, considered in the light of the familiar principles of law above stated, we think it is to be inferred that the board of directors had authorized the treasurer to

so act, for the officers of a corporation in the conduct of its affairs are presumed to be governed by an observance of the recognized principles of common honesty and good faith.

2.   Are the notes to be regarded as accommodation paper on the part of Johnson Brothers?

It has been noted that all the notes, excepting two (one for $1700 ; presented by the Marine Bank, $850 of which is in question, and a note for $1500 presented by the same bank) were indorsed on the back in the name of Johnson Brothers.    All the notes so indorsed were signed by the Monson Company as maker, except the note for $900 presented by the Lincoln National Bank, and that was signed by George W. Johnson as maker.    We refer to this particular note below.    With respect to all of the notes so indorsed the receivers, acting as masters under order of court, have reported that "we find that Johnson Brothers is an accommodation indorser,  .  .  .  . that such indorsements were not made in the regular course of business of said Johnson Brothers; and that such indorsements were without benefit to said Johnson Brothers, and were made without consideration."

This finding of the receivers as masters, being made a part of the case, is entitled to the weight of a jury verdict.    In *Shoe Co.* v. *Shoe Co.*, 103 Maine, 337, this court said :    "Upon all questions of fact the finding of the master has all the weight of a jury verdict, not to be set aside or reversed unless the evidence reported shows the finding to be clearly wrong."    No evidence has been reported in this case.    The report, however, does contain what has been called a general agreed statement of facts, and special agreed statements relating to the origin and history of each note in question. Unless, then, there is evidence in the agreed statements of facts showing the finding of the masters to be clearly wrong, that finding controls.    We have already referred to substantially all the facts as disclosed in the general agreed statement, and we think it a fair conclusion that there are no facts therein recited which specifically disprove or contradict the receivers' finding that the indorsement of these notes by Johnson Brothers was for the accommodation of the Monson Company.    It is suggested, however, that the business

relations of the two corporations, and especially the fact that the Monson Company was largely indebted to Johnson Brothers on open account and notes, and that the latter held $10,000 of the bonds of the former, show that Johnson Brothers had an interest in the business welfare and financial condition of the Monson Company that was sufficient to constitute a valid consideration for its indorsements of that company's paper.    Our attention has been called to *Blake* v. *Domestic Manuf"g Co.*, supra, as a case in support of the principle involved in the suggestion.    The questions presented in that case, as in this, arose out of the failure of two corporations, the Domestic Sewing Machine Company and the Domestic Manufacturing Company, and it was there contended that certain notes held by banks should not be allowed against the Manufacturing Company because indorsed by it for the accommodation of the Sewing Machine Company.    It there appeared that each company was incorporated for both the manufacture and sale of sewing machines, but the business was divided between the companies so that the manufacturing company made the machines and the other company sold them.    The notes there in question were given by selling agents and customers to the Sewing Machine Company and then indorsed by the Manufacturing Company, and the proceeds thereof credited to it in the first instance.    The court there found that the business of manufacture and sale of sewing machines was, in point of fact, carried on by the two companies as one entire business, in which both companies were dependent for their continuance upon the realization of the proceeds of sale of the finished product represented by the notes of customers and agents, which were required to be discounted in order that the funds necessary for the continued manufacture as well as sale might be provided.    The court, after an exhaustive analysis of the facts and circumstances, reached the conclusion that in view of the manner in which the business of the two companies had been conducted, their intimate and complicated relations, their joint interest in the ultimate payment of the notes, and on the whole circumstances of the case, the notes were not accommodation paper on the part of the Manufacturing Company. It is thus seen that the intimate business relations which existed

between the two corporations in that case differ widely from what appears in the case at bar to have been the business relations between Johnson Brothers and the Monson Company.    In that case the two corporations were engaged in one entire business, each, however, carrying on a separate but dependent part; in this case each corporation was carrying on a separate business, not necessarily connected with that of the other.    There the notes were indorsed by the Manufacturing Company so that the proceeds could be made available for the continuance of the entire business, and the proceeds were all placed to the credit of the indorser; here Johnson Brothers indorsed the notes to enable the Monson Company to receive the proceeds to use in its business in which, at the most, the indorser had no other interest than that of a voluntary creditor. The suggestion is made in some cases that a corporation may be impliedly authorized to loan its credit to its debtor if by so doing it could make available a debt due. it, arising out of a reasonable exercise of its corporate powers, and which otherwise would be lost.    It is not necessary, however, here to consider if that suggestion has merit, for it seems clear to us that the facts and circumstances of this case do not bring it within the reach of an application of such a doctrine.    The inference seems justifiable that the practice of using the corporate name of Johnson Brothers for the benefit of the Monson Company had its inception and was continued not because it seemed imperatively necessary so to do in order to protect and secure the then existing indebtedness from that company to it, and save its own assets, but chiefly, if not solely, to advance and promote the affairs of the Monson Company, in which George W. and Ernest A. Johnson were so deeply interested.    To hold that a trading corporation, having so improvidently conducted its affairs as to permit another corporation to become its debtor on open account and notes for more than ninety thousand dollars, for goods sold, money paid, advanced and loaned, during a period of nearly fifteen years, was also justified, because of that condition, in issuing accommodation paper for the benefit of such corporation, during the same period, would be, in the language of the late Judge Walton, "a doctrine as startling as it would be unprecedented."

And we do not think the business relations existing between Johnson Brothers and the Monson Company, as disclosed in this case, should be held to be a consideration for the indorsement of the paper in question.

In the general agreed statement it is recited that "Except as set forth in the agreed statement of facts relating to particular claims, or as shown by the facts as herein stated, it is agreed that there is no other or further consideration for the execution of negotiable paper for the Monson Company by Johnson Brothers, whether the latter corporation be considered a co-promisor, indorser or guarantor."

From an examination of the special agreed statements of fact giving the history of each note we find no evidence which would authorize a reversal of the finding of the receivers that the notes were indorsed by Johnson Brothers for accommodation and without consideration, except in respect to the following notes.

The history of the $10,000 note presented by the Marine National Bank is, that this note is a consolidation of several notes given by the Monson Company with Johnson Brothers, originally issued as follows: Aug. 15, 1895, $500; Nov. 5, $2000; Dec. 12, $1000; Jan. 11, 1896, $500; Mch. 18, 1897, $1500; July 21, $700; Dec. 29, $700; April 28, 1899, $800; aggregating $7700. Some of the notes were also indorsed by other parties. It is further agreed that, "On June 27, 1899 a note of $8,000.00 signed by Monson Co., with Johnson Bros. and G. W. Johnson as co-makers and $10,000 bonds of the Monson Co. as security, was taken by the Bank, and the net proceeds, $7,838.40, were credited to Monson Co. and Monson notes as follows paid: disc. 7-19, 2000; 8-29, 700; 8-28, 1500; 7-15, 1500; (being a consolidation of the $1000 note and second $500 note above mentioned); 5-28, 800; to amount of $6,469.56 charged up. (Int. on notes not matured, $30.44, having been allowed.) This $8000.00 was renewed from time to time. On Feb. 6, 1901 a loan was made to the Monson Co., that company signing on the face and Johnson Bros. on the back, for $1200, 15 days; and Aug. 21, '01 another similar loan for $800.00, 12 days. These loans were merged into

a $10,000.00 note signed as above by Monson Con. Slate Co. and Johnson Bros., with $10,000 Monson bonds as collateral, which from time to time has been extended and through its renewals is the note in controversy. It is agreed that the proceeds of all the foregoing notes went to the Monson Co."

It thus appears that the first four original notes amounting to $4000, included in the foregoing statement, were issued prior to the incorporation of Johnson Brothers, and they were signed by the partnership. This was a liability of the partnership which the corporation assumed. When the corporation signed renewals of those notes in place of the partnership name its act in so doing was not we think entirely without consideration. Its assumption of the partnership liability on the original notes was a consideration for its undertaking in becoming a party to their renewals. When the $8000 note was given on June 27, 1899, it was not in effect such a payment of the notes previously given, including the $4000, as would change the real status of the corporation in respect to that $4000. It was in reality a renewal of the several notes consolidated into one. The substance and purpose of the transaction and not the way in which it was done should control. Accordingly we reach the conclusion that the $10,000 note in question includes $4000 which has been a legal, if only a contingent, liability of Johnson Brothers since its incorporation.

The history of the note for $900 presented by the Lincoln National Bank shows that an original note for $3300, of which this is a balance, was issued prior to the incorporation of Johnson Brothers, on which the partnership was liable. For reasons similar to those given above in respect to the $10,000 note we conclude that Johnson Brothers has had a certain legal liability for the amount of this $900 since its incorporation, and that it cannot be properly held that its act in indorsing this note was entirely without consideration.

There is one other note, that for $1200 presented by the Lincoln National Bank, which appears to have had its inception in a note of $750 which Johnson Brothers while a partnership had indorsed. It appears that this note was reduced to $400 and that balance was

paid from the proceeds of a $1500 note on which the corporation of Johnson Brothers was a party. The $1500 note was consolidated with another later, making a $2500 note, and this was reduced to the $1200 note in question. Because of the reduction of the original $750 note to $400 at least, and the further reduction of the consolidated note of which this balance may have been a part, we are unable to determine that the $1200 note now in question includes any part of the original note of $750 on which the partnership was liable, and, therefore, we think this note for $1200 must be regarded as accommodation paper on the part of the Johnson Brothers corporation.

Except as above stated with reference to the $10,000 note and the $900 note, we find, in accordance with the report of the masters, that all the notes in question which were indorsed by Johnson Brothers (and they include all the notes except the first two presented in favor of the Marine National Bank) are to be regarded as accommodation paper by Johnson Brothers to the Monson Co.

The other two notes were signed by the defendant corporation as maker and were payable to the bank. The $1500 note was originally given May 24, 1905. At that time the Monson Co. owed the bank for overdue interest and an overdraft. The cashier insisted on payment. The Monson Company then had no means with which to pay and could not legally borrow more of the bank. Thereupon George W. Johnson, treasurer of both corporations, said "he would put in a note of Johnson Brothers endorsed by himself for discount." This was done and the proceeds were carried to the Monson Company's account and used to pay the indebtedness. There can be no doubt that as between the two corporations this note was given by Johnson Brothers for the accommodation of the Monson Company.

The remaining note presented by the Marine National Bank, of which $850 is in question, is for $1700, and was issued March 2, 1910, under these circumstances. At an interview between George W. Johnson and representatives of the three banks he asked for a loan of $3000 to tide both corporations over then existing financial difficulties. In behalf of the Marine Bank it was claimed at that interview that its portion of the loan must be made to Johnson

Brothers because the Monson Company then had its full limit of credit at that bank. Instead of $3000 the banks agreed to make a loan of $5100, or $1700 for each bank. The Marine Bank made its part of the loan on the $1700 note in question, signed by Johnson Brothers as maker and secured by $2000 of the bonds of the Monson Company. The proceeds of the loan was placed to its credit in that bank, but on the same day one-half thereof was by check of Johnson Brothers transferred to the account of the Monson Company in the same bank. Each of the other banks made its part of the loan on two notes for $850 each, one signed by the Monson Company and indorsed by Johnson Brothers, and the other signed by Johnson Brothers only. Under the circumstances stated we think this $1700 note must be regarded as accommodation paper by Johnson Brothers to the Monson Company to the extent of one-half of it, or $850. The facts and circumstances under which these notes last mentioned were issued have an important bearing upon the question hereinafter considered, whether the banks had knowledge, or are chargeable with notice, of the accommodation character of the notes, and we have thus fully stated those facts and circumstances in this connection to avoid unnecessary repetition as far as possible.

3. We come now to the question whether this accommodation paper in the hands of the banks is valid against the defendant corporation in this proceeding.

The general rule is that it is ultra vires of a corporation to make accommodation paper.

"Unless the corporation be specially authorized to do so, the execution or indorsement of accommodation paper for the benefit of third persons is an act beyond the scope of its corporate authority." Daniel on Neg. Ins. (4th Ed.) sec. 386.

"Judicial authority is nearly unanimous to the effect that a corporation has no power to make or indorse commercial paper for the mere accommodation of another person or corporation." 4 Thom. Corp. sec. 5739.

"A corporation, as has been seen, may issue and indorse negotiable bills and notes whenever it is necessary or usual in the course

of its authorized business; but by the overwhelming weight of authority, a corporation has no power to issue or indorse, for the accommodation of others, bills or notes in which it has no interest, unless, as is seldom if ever the case, such power is expressly conferred." 7 Eng. & Am. Ency. Law, (2d Ed.) 793.

"The proposition is well supported by authority that it is ultra vires of a corporation to execute accommodation paper or to enter into contracts of guaranty or suretyship not in furtherance of its business, unless given express authority to do so." Mr. Freeman in note to In re Assignment Mutual, etc., Ins. Co., 70 Am. St. R. page 164.

The following are some of the many cases in which this doctrine is affirmed : *Bank* v. *Remsen*, 43 Fed. 226 ; *Bank* v. *Atkinson*, 55 Fed. 465 ; *Tod* v. *Land Co.*, 57 Fed. 47; *Sav. Bank* v. *Shawnee Bank*, 95 U. S. 557 ; *Blake* v. *Mfg. Co.*, 64 N. J. Eq. 480, (1897) 38 Atl. 241 (supra) ; *Culver* v. *R. E. Co.*, 91 Pa. St. 367 ; *Bank* v. *German, etc., Co.*, 116 N. Y. 281 ; *Cook* v. *Am. Tubing & Webbing Co.*, 28 R. I. 41, 65 Atl. 641 ; *Bank* v. *Snyder Mfg. Co.*, 102 N. Y. S. 478 ; *Owen & Co.* v. *Storms & Co.*, 78 N. J. L. 154, 72 Atl. 441. See also *Davis* v. *Old Colony Railroad*, 131 Mass. 258. The same principle was approved and applied in *Franklin Co.* v. *Sav. Bank*, 68 Maine, 43, although the act there held to be ultra vires was not the execution of accommodation paper.

But is it contended by the several banks that if the notes in question are to be regarded as accommodation paper, and for that reason ultra vires of the defendant corporation, nevertheless, they are valid in the hands of the banks as bona fide holders of them for value.

We might otherwise perhaps have proceeded at once to consider if it appears in this case that the banks are innocent holders of the notes in question, but the learned counsel for the receivers urges that this court should accept the doctrine, and apply it in this case, that all contracts ultra vires are not merely voidable but absolutely void.

There is a class of authorities in which that doctrine is maintained. It is the rule announced in the federal cases, of which the following may be considered leading ones. *Pittsburg, etc.,* v. *Keokuk, etc., Co.*, 131 U. S. 371 ; *Central Transp. Co.* v. *Pullman*

*Car Co.*, 139 U. S. 24; *Union Pac. Railway* v. *Chicago, etc., Railway,* 163 U. S. 564; and *California Bank* v. *Kennedy,* 167 U. S. 362.   The fundamental reason for this doctrine is stated to be that because the corporation had no power to make the contract, nothing that is done under the contract by any party can infuse any vitality into it.   And in the Union Pacific case, supra, Mr. Chief Justice Fuller said :   "A contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable by the application of the doctrine of estoppel."

There is, however, another class of authorities maintaining that this doctrine, (that every contract and undertaking of a corporation ·made beyond the scope of its corporate authority is null and void under all circumstances), is too rigid.   In the very recent case of *Oakland Electric Co.* v. *Union Gas & Electric Co.,* 107 Maine, 279, 72 Atl. 282, this court said :   ·"It would seem from the later opinions of courts and jurists that the doctrine of ultra vires is thought to have been heretofore too often and too strictly applied, especially in cases of contracts of corporations (other than municipal at least) not in themselves harmful to the public."   And the court there pointed out that "a distinction is made, and is apparent, between contracts foreign in nature to those contemplated in its charter and contracts merely in extension of some corporate power."   Such distinction is essentially important to be regarded in the determination of the question whether accommodation paper of a corporation should be held good in the hands of an innocent holder for value.   It is too well settled to be now questioned that a private corporation organized for pecuniary profit, unless forbidden in its charter, may borrow money whenever the necessity of its business requires, and issue customary evidences of debt therefor.   Such power is incidental to that expressed in its charter, because necessary in carrying out the purposes of its incorporation.   4 Thom. Corp. sec. 5697.   Such corporation, thus having the power to issue notes, merely exceeds the limit of its right to exercise the power when it issues notes for accommodation.

But the reason given in the cases, holding to the rigid application of the defense of ultra vires, as a justification for the hardship resulting to innocent parties, is, that every person dealing with a corporation may know, and is bound to take notice of, the legal limits of its powers. But, whether a note was issued by a private corporation for its own debt, or for the accommodation of another party, depends upon the intent and purpose of its issue, and not necessarily upon any difference in the act of its issue. How, then, may a person taking such note determine if it be or not accommodation paper? Certainly not from an examination of the charter of the corporation, for that would not disclose the fact. Must the party taking such note ascertain in some way, at his peril, the intent and purpose of the corporation in its issue? We think not, but on the other hand are of opinion that the more reasonable doctrine, with reference to the liability of private corporations on accommodation paper, is, that the title of the holder of such paper before maturity can only be defeated by proof that he took it with knowledge that it was accommodation paper, or under such facts and circumstance that he is chargeable with notice of that fact. The following are a few of the authorities which sustains this doctrine. *Bird* v. *Daggett*, 97 Mass. 494 ; *Monument National Bank* v. *Globe Works*, 101 Mass. 57 ; 4 Thom. Corp. secs. 5738 & 5740 ; *Webster* v. *Howe Machine Co.*, 54 Conn. 394 ; *Republic Natl. Bank* v. *Young*, 41 N. J. Eq. 531 ; *Blake* v. *Domestic Mfg. Co.*, 64 N. J. Eq. 480, 38 Atl. page 259 ; *Jacobs Pharmacy Co.* v. *Southern Banking & Trust Co.*, 97 Ga. 573, 25 S. E. 171 ; *Bank* v. *Gas Light Co.*, 72 Conn. 582, 45 Atl. 361 ; 1 Am. & Eng. Enc. Law (2d Ed.) pages 348, 349, cases cited. Morawetz on Corp., sec. 65, and cases cited. 10 Cyc. page 1115 (C,) and cases there cited.

Were the banks bona fide holders of the notes in question?

In respect to the $1700 note ($850 of which is in question) and the $1500 note, both presented by the Marine National Bank, the defendant corporation was the maker, and the bank the payee, of each note. We have already stated with some detail the facts and circumstances, of which the bank had full knowledge, under which

each of these notes was given.   Briefly stated those facts and circumstances show, that the $1700 note represented a loan by the bank for the benefit of both the defendant corporation and the Monson Company, but the note was taken from the defendant company alone to avoid what would otherwise be an excess loan to the Monson Company; and that the $1500 note was given to the bank by Johnson Brothers for funds to pay, and they were used to pay, an indebtedness of the Monson Company to that bank.   But it is contended in behalf of the bank that its knowledge of those facts and circumstances is not enough to defeat its title to the notes, and in support of the contention it maintains, that knowledge on the part of a bank that a corporation intends to use the money obtained from the bank on its note for a purpose ultra vires of the corporation will not alone invalidate the note in the hands of the bank.   But we think the facts in this case do not limit the bank's connection with these notes merely to information  that Johnson Brothers was intending to loan the proceeds to, or apply them for the benefit of, the Monson Company ultra vires.   It knew that the specific transactions were to be carried out, and it may fairly be regarded we think as assisting in furthering the consummation of them.   As to the $1700 note the bank was a party to  the conference at which the three banks agreed to loan for the benefit of both corporations $5100, divided equally between the banks. It was then informed of the financial condition and needs of the two corporations, and that if one of them failed both would.   It knew that Johnson Brothers was to use its name for the accommodation of the Monson Company in getting this loan, and it was implicated in, and aided in, the consummation of the specific transaction—the giving by Johnson Brothers of the note of $1700, one-half of which was for the benefit of, and was placed to the credit of, the Monson Company.   And as to the $1500 note, we think the bank's connection with that can not be limited to the mere making of a loan to Johnson Brothers with knowledge, however, that Johnson Brothers intended to use the proceeds to pay a debt of the Monson Company.   The bank had a closer connection than that in the specific transaction.   The debt to be paid was due the

bank. It knew the Monson Company could not pay it, or raise money to pay it, and under these circumstances it took Johnson Brothers note, knowing that it was given to pay the other corporation's debt to the bank.

For these reasons, and under all the facts and circumstances of the case, it is the opinion of the court that the Marine National Bank cannot be regarded as a bona fide holder of these two notes— the $1700 note to the extent of $850 thereof, and the $1500 note— and without notice that they were given by Johnson Brothers for the accommodation of the Monson Company.

As to all the other notes the receivers as masters have reported, that, "We find that Johnson Brothers is an accommodation indorser; that in all these cases the payee took the notes of the Monson Consolidated Slate Company, either having actual knowledge, or charged with notice of that fact." Here is a clear, definite specific finding of fact by the masters. We have no record of the evidence on which they based that finding. Except as hereinbefore noted respecting the $10,000 note, and the $900 note, there is no evidence before us to justify a reversal of that finding. The learned counsel for the banks has argued several propositions in support of the claim that the banks should be regarded as bona fide holders of the notes indorsed by Johnson Brothers; for example, that the legal presumptions are in the banks' favor that such instruments are presumed to have been executed in the regular course of business and to be legal, and that the position of the names upon the notes is not notice of any accommodation character of the paper, especially under the rule adopted in this State, that one not appearing to be a party either as payee or indorsee of a note payable to a payee therein named or his order, who puts his name on the back of it in blank at its inception and before negotiated, is an original promissor. Those are pertinent considerations bearing upon the question whether the banks were in fact bona fide holders. But the finding of the masters upon that question must control in the absence of evidence that will justify its reversal, and as before stated, no such evidence is before us.

On the other hand as tending to show, at least, an opportunity for two of the banks to acquire notice of the accommodation character of the notes, it appears in the agreed statement that one Randall D. Bibber of Bath was an incorporator and director of the Slate Company from its incorporation to the date of his death in 1910; that he was its President for more than eight years; and that during all that time he was a director, and for the most of the time Vice President, of the Marine National Bank. Horatio A. Duncan was a director of the Slate Company from Aug. 3, 1897, to date, during all of which time he was a director and also Cashier or President of the Marine National Bank. Edward W. Hyde has been a director and President of the Slate Company since January 6, 1903, and during the same time he has been a director and Vice President of the Marine National Bank, and also a director and President of the First National Bank during practically all of that period. Silas H. Duncan was a director of the Slate Company for about four years, and during the same period Cashier of the Marine National Bank.

We have above expressed the opinion that $4000 of the $10,000 note presented by the Marine National Bank, and the $900 note presented by the Lincoln National Bank, are not to be regarded strictly as accommodation paper on the part of the defendant, and accordingly the conclusion follows that those amounts should be allowed.

With respect to the $10,000 note it is urged that inasmuch as a part of the amount of the note is allowable the whole must be. We think not. This is not an action at law, but a proceeding in equity in which the court has power to allow so much of the amount of a note as appears to be a valid claim against the defendant, and disallow the rest.

It is therefore the opinion of the court that all the claims, specified in the report of this case, as presented in behalf of the respective banks, are to be disallowed, except $4000 of the $10,000 note presented by the Marine National Bank, and the $900 not presented by the Lincoln National Bank, which are to be allowed.

## CLAIM OF BACON & ROBINSON COMPANY

The agreed statement of facts relating to this claim is as follows:

"For the purpose of this trial and for no other purpose it is agreed that sometime prior to July 1st, 1905, Alfred J. Robinson, Treasurer of Bacon & Robinson Co. met G. W. Johnson, Treasurer of Johnson Bros. and also Treasurer of Monson Consolidated Slate Company in Bath. At that time the subject of supplying the Monson Company with coal was considered and Mr. Robinson told Mr. Johnson that they would refuse to supply the Monson Company with coal on its credit. Mr. Robinson on behalf of the Coal Company, however, offered to furnish the Slate Company with coal in such quantities as might be ordered, on the express condition that each and every shipment should be paid for on its receipt by the Slate Company with a promissory note signed by the Slate Company and endorsed by Johnson Bros. Mr. Johnson told Mr. Robinson that Johnson Bros. would endorse the notes for the Slate Company. Up to that time the Coal Company had not furnished the Slate Company with any fuel.

In pursuance of this arrangement from time to time for the next five years coal was shipped to the Slate Company by the Coal Company on the former's orders. From time to time viz: on receipt of each shipment, joint and several notes of the Slate Company, signed on the back thereof by Johnson Bros. were returned to the Coal Company. The notes were practically always signed by Monson Consolidated Slate Co., G. W. Johnson, Treasurer, and on the back by Johnson Bros., G. W. Johnson, Treasurer.

It is admitted that E. A. Johnson and E. F. Johnson stockholders and directors of Johnson Bros. knew in a general way that such notes were being given to Bacon & Robinson Company from time to time on account of fuel furnished the Slate Company.

A joint and several note dated March 1, 1910, for $300.00 of the Monson Consolidated Slate Co. and Johnson Bros., the name of the first corporation appearing on the face of the note, and of the latter on the back thereof, each being affixed by its Treasurer, G.

W. Johnson, payable in two months, given for coal shipped the Slate Company, has not been paid.  Likewise another joint and several note, bearing the same date, for $400.00, executed and signed by the Slate Company and Johnson Bros., in the same way, remains unpaid. ' These two notes are the basis of the claim involved in this controversy."

The principles we have discussed and applied with respect to the notes presented by the banks are applicable to the notes which are the basis of this claim.

The indorsement of Johnson Brothers on these notes was for the accommodation of the Monson Company, and the claimant had knowledge of that fact—indeed the claimant suggested the indorsement, without which it would not give credit to the Monson Company.

But the learned counsel for the claimant urges, as was done in behalf of the notes presented by the banks, that the business relations existing between Johnson Brothers and the Monson Company was a sufficient consideration for the former to make the agreement with the claimant under which these indorsements were made.  We have hereinabove considered this precise question at some length, and expressed the conclusion that the business relations existing between these two corporations, as disclosed, should not be held a sufficient consideration for Johnson Brothers to make accommodation indorsements for the Monson Company.  We need not here restate the reasons for that conclusion.  We have examined the cases cited in behalf of this claimant on this point, some of which are in addition to the cases cited by the counsel for the banks, and we find that in all of them the business relations existing between the alleged accommodation indorser, surety or guarantor and the other party to the paper or contract, were of an entirely different character from the business relations existing between Johnson Brothers and the Monson Company.  For example, in *Whitehead* v. *American Lamp & Brass Co.*, 70 N. J. Eq. 581, 62 Atl. 554, the court said :  "The defendant company was engaged in a manufacturing business, to carry on which certain articles were being manufactured for its account by the Clark Bros. Glass Company, to

produce which the materials furnished by the claimant were essential. They could not be had from the claimant without the guaranty of the defendant company, which was given for the purpose of continuing its own business, and resulted in a direct benefit to it in the prosecution of the business it was chartered to carry on." And in the case of *Hess* v. *W. & J. Sloane*, 73 N. Y. Sup. 315, cited by the claimant, it appears that the alleged accommodation indorser actually received the proceeds of the note. If Johnson Brothers had received the coal for which the note was given, a much different question would have been presented. But there is no evidence in this case that the furnishing of coal by the claimant to the Monson Company was of any direct benefit to Johnson Brothers, or in fact of any indirect benefit to it, except so far as such an indirect benefit may arise from the fact that Johnson Brothers had become a voluntary creditor of the Monson Company. It does not appear that Johnson Brothers, in carrying on its corporate business, was dependent upon a continuance of the business the Monson Company was engaged in — otherwise than that the latter company was indebted to it. Johnson Brothers was not incorporated to sell or deal in the products of the Slate Company, and it is not shown that in did so.

The court is constrained to the opinion that the indorsement by Johnson Brothers of these notes was for the accommodation of the Monson Company, and without consideration, and that the claimant received the notes with knowledge of that fact. The conclusion therefore necessarily follows that this claim is not provable against Johnson Brothers in this proceeding.

It is therefore the opinion of the court that all the claims presented against Johnson Brothers as specified and enumerated in the report of this case are to be disallowed, except $4000 of the $10,000 note presented by the Marine National Bank, and the $900 note presented by the Lincoln National Bank. Decree to be made accordingly.

*So ordered.*