(No. 14037.—Reversed and remanded.)

E. N. ARMSTRONG, Receiver, *et al.* Appellees, *vs.* LOUIS L. EMMERSON, Secretary of State, Appellant.

*Opinion filed October 22, 1921—Rehearing denied Dec. 9, 1921.*

1. CORPORATIONS—*what is meant by capital stock of corporation.* The capital stock of a corporation, unless the context of the charter indicates a different meaning, is an invariable sum fixed by the charter as the amount to be paid in by the stockholders for the prosecution of the business of the corporation and for the benefit of the corporate creditors, and the term does not include the capital of the corporation or its actual property, the value of which may fluctuate from time to time.

2. SAME—*a public utility corporation may be taxed on the full amount of authorized capital stock under section 105 of Corporation act.* In assessing the franchise tax of a public utility corporation under section 105 of the general Corporation act, as amended in 1919, the tax may be assessed on the full amount of the capital stock authorized by its charter even though such stock can be issued only with the consent of the Public Utilities Commission, as the unissued part of the stock of the corporation is a part of its authorized capital stock.

3. SAME—*appointment of receiver of railroad company does not enlarge or restrict corporate powers.* The appointment of a receiver for a railroad company creates no change in the corporate body but its existence continues with its legal functions unimpaired, its acts being performed by agents appointed by the court and not by the corporation, and the court and its agents are bound to manage the corporation in accordance with the charter and within the limits and duties imposed thereby.

4. SAME—*corporation whose property is in hands of receiver is subject to franchise tax under section 105 of Corporation act.* A corporation whose property is in the hands of a receiver is subject to the franchise tax under section 105 of the general Corporation act, as amended in 1919, as section 102 of the act indicates such an intention in requiring the report upon which the assessment is to be based to be signed by the assignee, receiver or trustee of such a corporation.

5. RAILROADS—*act of Congress for control of railroads did not deprive States of power to assess franchise tax.* The act of Congress providing for the operation and control of railroads by the Federal government, known as the Federal Railway Control act, did not deprive the States of the power of taxation of railroads

which they possessed and exercised prior to the passage of the act, and section 1 of said act, by providing that taxes assessed "either on the property used under such Federal control or on the right to operate as a carrier" shall be paid out of revenues derived from operation under Federal control, expressly provides for the payment of franchise taxes.

6. SAME—*franchise tax of interstate railroad is not a burden on interstate commerce.* The assessment of a franchise tax, under section 105 of the Corporation act, against a railroad company engaged in interstate commerce does not impose a burden upon interstate commerce. (*American Can Co.* v. *Emmerson,* 288 Ill. 289, and *Hump Hairpin Manf. Co.* v. *Emmerson,* 293 id. 387, followed.)

APPEAL from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, (CLARENCE N. BOORD, and JAS. W. GULLETT, of counsel,) for appellant.

GEO. B. & GEO. M. GILLESPIE, (J. M. ELLIOTT, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Toledo, Peoria and Western Railway Company is a corporation organized under the laws of the State of Illinois, and on July 2, 1917, E. N. Armstrong was appointed receiver for it under a decree of the United States district court for the southern district of Illinois and has since his appointment been in possession of all its property and has operated its railroad exclusively under the control of that court, except during such time as the railroad was in the possession of the government of the United States and was operated under the act known as the Federal Railway Control act. The Secretary of State assessed the annual license fee or franchise tax provided by section 105 of the general Corporation act, as amended in 1919, upon the capital stock of the railway company in the year 1919 and notified the railway company and its receiver of such assessment, amounting to $2250, which they were required

to pay on or before July 31, 1919, or else the assessment would become delinquent and the penalties provided by the act would be added. The receiver appeared before the Secretary of State by counsel and endeavored to obtain a cancellation of the assessment, but the Secretary having refused to cancel or modify it, the receiver paid to the Secretary of State the sum of $2250, the amount of the assessment, under protest, and a bill was filed in the name of the railway company and the receiver to restrain the Secretary of State from paying the money over to the treasurer and to require him to re-pay it to the receiver. The bill, in addition to the facts stated, alleged that the railway company previous to the receivership was operating the railroad, extending from Effner, in the State of Indiana, through the State of Illinois and into the State of Iowa, and was engaged as a public utility in intrastate and interstate commerce as a common carrier of passengers and goods; that during the whole of the year 1919, for which the license fee or franchise tax was assessed, the railroad was operated exclusively by the Director General of Railroads of the United States; that neither the railway company nor its receiver was in possession, control or operation of the railroad or transacted any transportation business within the State of Illinois or elsewhere, and that if any franchise tax may be assessed against the railway company it should be assessed under section 107 of the general Corporation act instead of under section 106, as it was assessed by the Secretary of State. It is also charged that the assessment was wrongfully made upon the total amount of capital stock authorized to be issued under the laws of the State of Illinois, ($4,500,000,) of which $4,076,900, only, had in fact been issued, and before any additional stock of the company can lawfully be issued it will have to be authorized by the Public Utilities Commission of the State of Illinois. A temporary restraining order was entered restraining the Secretary of State from paying the

amount received into the State treasury. A demurrer to the bill was overruled, and the defendant having elected to stand by the demurrer, an order was entered perpetually enjoining the payment of the sum of $211.56 into the State treasury and requiring its return to the receiver. The defendant has appealed and the complainants have assigned cross-errors.

The only question raised by the appellant's assignment of errors is whether the assessment should be based upon the amount of $4,500,000, the total amount of capital stock which the corporation was authorized to have, or upon the amount of $4,076,900, the amount of capital stock which had been issued. The claim of the appellees that the assessment should be based upon the latter amount is founded on the fact that the corporation is a public utility corporation and its power to issue its stock is subject to the supervision, regulation and control of the State Public Utilities Commission, and can be exercised only under such rules and regulations as the commission may prescribe. The decision of the question requires the determination of the meaning of the words "authorized capital stock," in section 105 of the general Corporation act. The appellant contends that the language refers to the total amount of capital stock authorized by the articles of incorporation; the appellees, that it refers to the amount of capital stock which the corporation has been authorized to issue under the regulations of the Public Utilities Commission, in accordance with sections 20 and 21 of the Public Utilities act.

The expression "capital stock" or "authorized capital stock" is capable of use to express different meanings. It may be used to designate the capital stock which the corporation is authorized to have or the capital stock authorized by the directors to be issued, or, in the case of a public utility, the capital stock authorized by the Public Utilities Commission to be issued in accordance with its regulations. "Capital stock is the sum fixed by the corporate charter as

the amount paid in, or to be paid in, by the stockholders for the prosecution of the business of the corporation and for the benefit of corporate creditors. The capital stock is to be clearly distinguished from the amount of property possessed by the corporation. Occasionally it appears that, under the terms of statutes relating to taxation which have been drawn without regard to the technical meaning of words, the courts will construe the capital stock to mean all the actual property of the corporation. But this is for the purpose of carrying out the intent of the statute and is not the real meaning of the term. At common law the capital stock does not vary but remains fixed, although the actual property of the corporation may fluctuate widely in value and may be diminished by losses or increased by gains." (1 Cook on Stock and Stockholders, sec. 9; Morawetz on Private Corp. sec. 781; 2 Beach on Private Corp. sec. 466; *Farrington* v. *Tennessee,* 95 U. S. 679; *Markle* v. *Burgess,* 176 Ind. 25; *Tradesman Publishing Co.* v. *Knoxville Car Wheel Co.* 95 Tenn. 634; *State* v. *Clement Nat. Bank,* 84 Vt. 167.) It is this invariable sum fixed by the charter as the amount to be paid in by the stockholders for the prosecution of the business of the corporation and for the benefit of the corporate creditors which is ordinarily understood by the term "capital stock" unless the context indicates a different meaning. The capital stock is not the same thing as the capital of the corporation or its actual property, the value of which may fluctuate from time to time. However much the value of the property of the corporation may increase in the prosecution of a successful enterprise or may be diminished by losses incurred, the capital stock remains unchanged. The fees and franchise taxes which every corporation must pay under the general Corporation act are fixed by sections 96 to 107, inclusive, of that act. The initial fee is provided for by section 96 and is one-twentieth of one percentum upon the amount of the capital stock which the corporation is authorized to have,

and the section provides that each public utility corporation shall pay the same fees as are required to be paid for incorporation by other corporations organized for pecuniary profit. Section 99 provides that when a public utility corporation shall renew its charter or extend the term of its existence the Secretary of State shall charge and collect the same fees as provided in the case of a new company. The annual license fee or franchise tax which each corporation for profit, including railroads, (except insurance companies,) is required to pay by section 105 is also one-twentieth of one percentum upon the authorized capital stock. Public utility corporations are not specifically mentioned, but there is nothing to indicate that the authorized capital stock upon which the franchise tax of such corporations is to be assessed is any different from the authorized capital stock upon which other corporations are to be assessed.

In *American Can Co.* v. *Emmerson,* 288 Ill. 289, an objection was made to the amount of the tax assessed against a foreign corporation under section 5*b* of the Foreign Corporation act then in force, that in ascertaining the proportion of the capital stock represented by property located and business transacted in the State of Illinois the Secretary of State used as a basis the entire capital stock of the company, including the unissued as well as the issued capital stock, but it was held that the words referred to the amount of capital stock authorized by the charter and not the stock actually issued; and so it was held in *Hump Hairpin Manf. Co.* v. *Emmerson,* 293 Ill. 387.

A public utility corporation, upon filing the statement required by section 4 of the general Corporation act, becomes a corporation having an authorized capital stock of the amount provided in the statement, though such stock can only be issued with the consent and approval of the Public Utilities Commission. So under section 28, any corporation which in its statement of incorporation has specified an amount of stock which it is proposed to issue at once,

less than the total amount fixed by such statement, cannot issue any stock in addition to that specified as to be issued at once until a statement showing the total amount of the capital stock authorized by the articles of incorporation, the amount already issued, the extent to which it is paid up, the additional stock proposed to be issued and the manner in which it is to be paid up, with a description and valuation of property, if any, to be received in payment of such stock, and stating that of the capital stock then proposed to be issued at least one-half of the par value of such stock having a par value and not less than five dollars per share for each share of capital stock having no par value will be paid in in money or property, has been filed with and approved by the Secretary of State. In either case the unissued part of the stock of the corporation is a part of its authorized capital stock, though it may be issued only in compliance with the provisions of the statute authorizing its issue.

The court erred in holding that the tax should have been assessed only upon the stock actually issued and not upon the full amount of the authorized capital stock of the corporation.

By the assignment of cross-errors it is contended that no franchise tax could be imposed upon the corporation for the exercise of its franchise while its property and business were in the hands of a receiver or the Federal government. There is a conflict in the decisions as to whether a corporation is liable to a franchise tax when its property is in the hands of a receiver who operates and controls it. In *McCoach* v. *Minehill and Schuylkill Haven Railroad Co.* 228 U. S. 295, it was held that a railroad company which had leased its entire railroad, with all its rights, powers, privileges and franchises, except that of being a corporation, for a term of years at an annual rental, the lessees agreeing to keep the road in good repair and in public use and efficiently operated and return it to the lessor at the termination of the lease, was not engaged in business

within the meaning of the Federal Corporation Tax law, and was not, therefore, liable to the franchise tax imposed by that act upon corporations doing business in the State, although it retained the franchise of corporate existence, maintained its organization and held itself ready to exercise its corporate powers when required by the lessees and ready to resume possession of the property at the expiration of the lease. It was held by the same court that the income derived from the management of street railways by receivers operating such railways under the order of the court are not subject to the tax imposed by the same act. *(United States* v. *Whitridge,* 231 U. S. 144.) It has been held by some courts that the right of a corporation to do business ceases upon the appointment of a receiver and the franchise tax cannot be assessed against the corporation after such appointment. *(Johnson* v. *Johnson Bros.* 108 Me. 272; *State* v. *Bradford Savings Bank,* 71 Vt. 334; *Commonwealth* v. *Lancaster Savings Bank,* 123 Mass. 492.) In those cases, however, the receiver was appointed to wind up the affairs of the corporation under a proceeding for its dissolution and the corporation was deprived of the exercise and use of its franchise. It is said in Thompson on Corporations (vol. 5, sec. 6443) : "The receiver is liable for a franchise tax where he continues the business but not where he was appointed to wind up the corporation in a proceeding instituted by the State, and the reason is that the State has intervened and prevented the corporation from further exercising its franchise."

We have held that the appointment of a receiver for a railroad company creates no change in the corporate body but its existence remains with its legal functions unimpaired, its acts being performed by agents appointed by the court and not by the corporation. The court does not enlarge or restrict the powers and duties conferred by the charter but assumes the management of the corporation under and in accordance with the charter and is bound by

its provisions, and the agents appointed by the court are required to act within the limits of the charter and to perform the duties imposed by it. *Safford* v. *People,* 85 Ill. 558; *Ohio and Mississippi Railway Co.* v. *Russell,* 115 id. 52; *Bartlett* v. *Cicero Light Co.* 177 id. 68.

In *Central Trust Co.* v. *New York Central and Hudson River Railroad Co.* 110 N. Y. 250, it was held the receiver was liable to the franchise tax. It was said: "It is claimed, however, that when a receiver is appointed by the court, if he operates the railroad under its order he does so by virtue of the equity powers of the court conferred by the constitution, and hence that the receiver is not bound to pay the taxes although he receives all the earnings of the company. But what does the receiver operate? Under this order of the court he takes possession of all the property of the corporation and proceeds to operate,—that is, to run,—its trains and to do all that was formerly done under the direction of the board of directors. In this way he uses the franchise which has been conferred by the State upon the company, and he uses it as an officer of the court which is administering the affairs of the company, and, through the court, he acts as the company to the same extent *pro hac vice* as if the board of directors were operating the railroad. It is the franchise which is being used in both cases, only in one case it is used for the company and substantially by it by means of its board of directors, while in the other case the same franchise is being used and the road is operated under it by an officer of the court, until, by virtue of the legal proceedings connected with the receivership, the receiver is discharged and the road returned to its former possessors or other proceedings taken under a re-organization, as provided by law."

In *New York Terminal Co.* v. *Gaus,* 204 N. Y. 512, where the corporation was in the hands of a receiver, who continued to operate the property, it was held that the corporation was not dissolved but its franchise to conduct the

ferry business was in existence and any operation must have been by virtue of that franchise; that the receiver's operation of the ferry was under the corporate franchise and he was bound to pay the franchise tax for such operation, which was a lien on the corporate assets paramount to all prior incumbrances. "Where the receiver is carrying on the business of a corporation as a going concern, he is, in effect, exercising its corporate franchise, and the State properly looks to him to pay the tax imposed upon it." *State v. Sessions,* 95 Kan. 272; *Chesapeake and Ohio Railway Co.* v. *Atlantic Transportation Co.* 62 N. J. Eq. 751; *In re George Mather's Sons Co.* 52 id. 607.

Section 102 of the act, which requires the report to be made to the Secretary of State upon which the assessment of the franchise tax is to be based, provides, further, that in case the corporation is in the hands of an assignee, receiver or trustee, then such report shall be signed and verified by such assignee, receiver or trustee, thus specifically indicating an intention that the franchises of corporations whose property might be in the hands of assignees, receivers or trustees should be subject to the franchise tax.

It was held in *Wabash Railroad Co.* v. *Board of Review of Cook County,* 288 Ill. 159, that the act of Congress providing for the operation and control of railroads by the Federal government should not deprive the States of the power of taxation of railroads which they possessed and exercised prior to the passage of the act. By section 1 of the act it was provided that taxes assessed "either on the property used under such Federal control or on the right to operate as a carrier" should be paid out of the revenues derived from railway operation while under Federal control, thus expressly providing for the payment of franchise taxes.

The appellees, by way of cross-error, also contend that the tax imposes a burden upon interstate commerce; but this question was determined adversely to their contention

in *American Can Co.* v. *Emmerson, supra,* and *Hump Hair-pin Manf. Co.* v. *Emmerson, supra.* Those cases involve a license fee required to be paid by foreign corporations for the privilege of doing business in the State of Illinois, based upon the proportion of their capital stock represented by their property and business in this State, and it was held that the tax, though measured by capital used in part in the conduct of interstate commerce, was within the authority of the State, since the circumstances indicate no purpose to impose a burden on interstate commerce or that such will be the effect. This principle is sustained by the Supreme Court of the United States. *Maine* v. *Grand Trunk Railway Co.* 142 U. S. 217; *Wisconsin and Michigan Railway Co.* v. *Powers,* 191 id. 379; *Kansas City, Memphis and Birmingham Railway Co.* v. *Stiles,* 242 id. 111.

The decree of the circuit court will be reversed and the cause remanded, with directions to dismiss the bill.

*Reversed and remanded, with directions.*

---

(No. 13938.—Appellate Court reversed; circuit court affirmed.)
SOMERS, JONES & Co., Defendant in Error, *vs.* IDA SPELL-MEYER *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1921—Rehearing denied Dec. 8, 1921.*