(No. 21793.—

THE MAJESTIC HOUSEHOLD UTILITIES CORPORATION, Appellant, *vs.* WILLIAM J. STRATTON, Secretary of State, Appellee.

*Opinion filed June 22, 1933.*

Jones, Addington, Ames & Seibold, (Albert F. Mecklenburger, and Sidney Neuman, of counsel,) for appellant.

Otto Kerner, Attorney General, (B. L. Catron, of counsel,) for appellee.

Mr. Chief Justice Orr delivered the opinion of the court:

This is a suit to recover an annual franchise tax paid under protest. Only an interpretation of the statute is involved, but jurisdiction lies here on direct appeal from the circuit court because the case relates to revenue.

Appellant, the Majestic Household Utilities Corporation, (herein referred to as complainant,) filed its verified bill of complaint in the circuit court of Sangamon county to enjoin the Secretary of State (herein referred to as defendant) from paying to the State Treasurer the sum of $5937.49 theretofore paid to defendant under protest, as annual franchise tax for the year beginning July 1, 1932. Upon the filing of the bill a preliminary injunction was issued restraining defendant from paying the disputed sum to the State Treasurer until further order of court. Thereafter a general demurrer filed by defendant was sustained and the bill dismissed for want of equity. The injunction, however, was continued in force pending this appeal.

Complainant is an Illinois corporation. Its authorized capital consists of 600,000 shares of common stock of no par value, all of one class. The maximum number of issued shares was 500,000. On March 10, 1931, complainant transferred all of its assets, together with its good will, to the Grigsby-Grunow Company, an Illinois corporation, in consideration of the following: (a) 375,000 shares of the common capital stock of the Grigsby-Grunow Com-

pany; (b) the assumption by the Grigsby-Grunow Company of the liabilities of complainant; and (c) the cancellation of all inter-company indebtedness and investments between complainant and the Grigsby-Grunow Company, including a debt of complainant in excess of $1,000,000, and the agreement of the Grigsby-Grunow Company to surrender for cancellation 125,000 shares of common stock of complainant then held and standing of record in the name of the Grigsby-Grunow Company. Complainant then offered its stockholders (not including the Grigsby-Grunow Company) the opportunity to surrender their stock for cancellation and in exchange for shares of the capital stock of the Grigsby-Grunow Company on a share-for-share basis. This exchange and cancellation were effected to the extent of 352,323 shares, in addition to the 125,000 shares canceled by the agreement of exchange. On February 24, 1932, the date of its annual report to the Secretary of State, there were outstanding only 22,677 of the original 500,000 issued shares of complainant's stock.

The transaction above outlined was authorized and approved by the action of stockholders and directors of complainant and of the Grigsby-Grunow Company. The shares of complainant's stock surrendered from time to time in exchange for an equal number of shares of the Grigsby-Grunow stock were actually canceled and retired pursuant to resolutions adopted by complainant's directors and by more than two-thirds of its stockholders. From and after March 10, 1931, the date of the transfer of all the assets and liabilities of complainant to the Grigsby-Grunow Company, complainant ceased doing business in this State. Since that date complainant has had no property located in this State except the sum of $1000 in cash and a certain number of shares of Grigsby-Grunow stock held by a transfer agent for the purpose of issuance to complainant's stockholders, who thereafter surrendered their stock in exchange.

At an earlier date than March 10, 1931, complainant had received the aggregate sum of $11,874,975 in cash and property for the 500,000 shares of its issued capital stock. As to the 22,677 shares reported as issued and outstanding on February 24, 1932, the amount which complainant had received was $25 per share, or $566,925. Prior to February 24, 1932, complainant had not amended its corporate charter reducing its authorized capital stock. These facts appeared in the original amended annual reports filed by complainant in the office of the Secretary of State, dated February 24 and April 14, 1932, respectively. Any penalty which might have resulted from the filing of the amended annual report after, rather than before, the first day of April, 1932, was waived by defendant. Thereafter, as above stated, defendant assessed a franchise tax against complainant in the sum of $5937.49, based upon the maximum number of shares of complainant's stock at any time theretofore issued, namely, 500,000 shares, and the amount received therefor, namely, $11,874,975, rather than upon the number of shares issued and outstanding as of February 24, 1932, namely, 22,677 shares, and the amount received therefor, namely, $566,925. This is the action complained of.

It is not disputed that the Grigsby-Grunow Company, when it acquired all of the assets of complainant, issued 375,000 shares of its capital stock in part consideration therefor. A certificate with respect to the issuance thereof was filed pursuant to the statute and the required fees and franchise taxes were paid. In the month of February, 1932, the Grigsby-Grunow Company filed its annual report, from which its annual franchise tax was computed. This report filed with defendant showed the issuance of the 375,000 additional shares of Grigsby-Grunow stock and the consideration received therefor, being the net value of the assets acquired by the Grigsby-Grunow Company from

complainant. A franchise tax was assessed against the Grigsby-Grunow Company for the year beginning July 1, 1932, based, in part, upon the 375,000 shares so issued and the consideration received for them. The bill alleges that the franchise tax thereon has been paid or that the Grigsby-Grunow Company is liable therefor, and that the effect of the assessment against complainant—the subject matter upon which this bill is based—is double taxation.

By the provisions of "An act in relation to corporations for pecuniary profit," (Smith's Stat. 1931, chap. 32,) corporations may dissolve (sections 74-79, inclusive); they may merge or consolidate into a single corporation (sections 65-73 inclusive); or they may lease, exchange or sell all their corporate assets with the consent of two-thirds of all outstanding capital stock (section 6, sub-section 9). In the present case it is apparent that the last mentioned course was followed by an exchange of corporate assets, rather than a dissolution, merger or consolidation. Whether complainant will later be required to dissolve its corporate entity is of no present moment—it has exercised one of the powers expressly conferred upon it by statute. The exchange of all of its corporate assets to the Grigsby-Grunow Company was accomplished, as the statute requires, with the consent of two-thirds of all the outstanding capital stock of the corporation voted at a special meeting of the stockholders called for that purpose. The rights of all stockholders who did not vote in favor of the exchange of their stock for an equal number of shares of Grigsby-Grunow stock were protected by the provisions of section 73 of the same act, but, so far as the record shows, none of the minority stockholders objected to the transaction. No fraud or improper exercise of corporate powers is suggested or referred to in the record, and it is therefore our duty to assume that the transaction was entirely free from fraud or objection of any kind and was for the best interest of all concerned.

Section 105 of the Corporation act provides that each corporation for profit, excepting insurance companies, shall pay an annual license fee or franchise tax on its issued capital stock to the Secretary of State of five cents on each $100 of the proportion of its issued capital stock, or the amount to be issued at once, represented by business transacted and property located in this State. Where a corporation has stock of no par value its shares for such purpose shall be taken at the amount of consideration received or to be received for such shares. The franchise tax is computed in advance, commencing July 1 of each year. Section 28 of the same act provides for the filing of a certificate in the office of the Secretary of State whenever stock has been issued within the limit authorized by the articles of incorporation or any amendment thereto. No similar section provides for the filing of such a certificate when the issued stock has been reduced in any manner. Section 102 of the act provides that each corporation shall make a report in writing to the Secretary of State between the first day of February and the first day of March in each year, and section 109 provides that the Secretary of State "shall, from the annual report filed," assess the annual franchise tax. It was in compliance with these various sections that complainant filed its original and amended annual reports with defendant on February 24 and April 14, 1932. These reports disclosed the cancellation and retirement of all but 22,677 shares of complainant's stock and gave defendant information that complainant had ceased functioning as a corporation and that its assets had been completely taken over by the Grigsby-Grunow Company and were included in the annual report of that company. After receiving these various reports defendant erred in assessing a franchise tax against complainant on its full amount of 500,000 shares of issued stock, as all but 22,677 shares of its stock had been exchanged for stock in another corporation. The bulk of complainant's stock by

virtue of this transaction and for a good consideration, without fraud, had been canceled and removed from issue and was no longer subject to an annual franchise tax.

It is defendant's position that when stock has once been issued by a corporation it cannot be canceled, retired or withdrawn from issue except by an amendment to the charter of the corporation, in accordance with sections 34 and 59 of the Corporation act. In other words, defendant argues that once a corporation issues stock it thereafter shall remain issued for the purpose of fixing the annual franchise tax until the charter is amended or the corporation is dissolved, merged or consolidated. This position is untenable in view of the specific power conferred by the statute above mentioned (section 6, sub-section 9,) authorizing corporations to exchange or sell all of their corporate assets. No statutory provisions are to be found in this State which either expressly or by fair implication will lend support to defendant's position. Nor would such a construction be fair and reasonable as between the State and its tax-payers. In this case the State has lost nothing by the transaction, as the same franchise tax is collectible upon the 375,000 shares of issued Grigsby-Grunow stock as would have been collected from the same number of shares of complainant's stock given in exchange for it. Under these circumstances, to sanction the collection of franchise taxes from both corporations would be double taxation, because after the exchange the corporate assets of complainant were included within the assets and corporate values represented by the newly issued Grigsby-Grunow stock.

The information furnished to defendant by complainant in its annual report executed February 24, 1932, was, that it had transacted no corporate business whatsoever after March 10, 1931, and that its only property was $1000 in cash and 22,677 shares remaining of its issued capital stock. This remaining stock had not been exchanged for an equal number of shares of Grigsby-Grunow stock but

was in the hands of its transfer agent for that purpose.
Complainant had issued a total of 500,000 shares. Of this'
number 125,000 shares had been issued to the Grigsby-
Grunow Company and by the terms of the exchange had
been canceled and retired, in consideration of the cancel-
lation of a debt of over one million dollars owed by com-
plainant. Stockholders owning the remaining 352,323
shares of complainant's stock had at the time of making
the report to defendant exchanged their stock for an equal
number of Grigsby-Grunow shares, and their stock in com-
plainant's company had likewise been canceled and retired.
This procedure was in accordance with the power impliedly
conferred upon the corporation by section 6, sub-section 9,
above referred to. This is true, for under this particular
agreement an exchange and delivery of Grigsby-Grunow
stock without a corresponding cancellation and retirement
of complainant's issued stock would have left the trans-
ferred assets burdened with two separate stock issues. Such
a result would not be an exchange in any sense of the word.
The purpose of the transaction was not to effect a reduc-
tion of the capital stock of complainant but rather to retire
and cancel its stock by a transfer of its corporate assets to
another company. Since no attempt was made by com-
plainant to reduce its capital stock in the manner provided
by section 34 or to decrease the number of its shares un-
der section 59, no amendment to its charter was required.
Its effect was not to render the corporation bankrupt or
insolvent.

When certificates of stock are officially executed and
delivered by the corporation to its stockholders they are
issued, in the ordinary sense. However, when such stock
is called in and canceled of record in exchange for stock
of another corporation the original shares of stock can no
longer be said to be issued. They are then permanently
retired and removed from issue. Whatever doubt or un-
certainty there might be in this regard, it is a fundamental

rule of statutory construction that taxing statutes must be construed strictly. (*People* v. *Chicago and Eastern Illinois Railway Co.* 314 Ill. 596.) In interpreting statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government and in favor of the citizen. (*Gould* v. *Gould*, 245 U. S. 151; *Bowers* v. *New York and Albany Lighterage Co.* 273 id. 346.) Stock once issued and afterwards surrendered and canceled by the issuing corporation may be said to be removed from issue when it has been permanently withdrawn from circulation with no duplicate or substitute available for re-issue. If complainant had used some of its surplus assets to purchase its own stock and was holding the same in its treasury subject to re-issue at the time of its annual report to defendant, then it would be liable to payment of an annual franchise tax on all of such stock, as in that case all of its stock would either be actually issued or available for immediate issue. But that is not this case. It was not necessary in this case for complainant to take any steps to reduce its capital stock, as it did not desire to continue in business. It had an equal right, under the statute, to exchange its corporate assets, evidenced by its stock, for stock of another corporation. Having effected such an exchange and cancellation as to all but 22,677 shares of its stock prior to July 1, 1932, it was the duty of defendant to fix and assess its franchise tax upon the number of issued shares then in existence and the amount received therefor. Under these circumstances the demurrer should have been overruled by the trial court.

In accordance with the above, the decree of the circuit court of Sangamon county is reversed and the cause is remanded to that court, with directions to overrule the demurrer.          *Reversed and remanded, with directions.*