(No. 2256—

MOLINE-ROCK ISLAND MANUFACTURING COMPANY, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed June 1, 1935.*

THOS. P. SINNETT AND J. HAYS BRITTON, for claimant.

OTTO KERNER, Attorney General; JOHN KASSERMAN, Assistant Attorney General, for respondent.

MR. CHIEF JUSTICE HOLLERICH delivered the opinion of the court:

Claimant filed its complaint herein on November 1, 1933 and seeks to recover the sum of $1,440.00 which it claims to

have paid as a franchise tax for the year beginning July 1, 1933 and ending June 30, 1934, in excess of the amount which it was legally required to pay under the terms and provisions of The General Corporation Act of 1919, as amended.

It appears that on February 27, 1933 the claimant, in accordance with the law then in force, filed its annual report with the Secretary of State, in which it stated that the issued capital stock of the Company was $2,900,000.00. Based upon such statement, the amount of the franchise tax due from the claimant under the then existing law was $1,450.00. Notice of the amount of such tax was forwarded by the Secretary of State to claimant under date of May 15, 1933, and was received by it on June 15, 1933. Shortly thereafter claimant issued its check, payable to the Secretary of State, for the sum of $1,450.00 in full payment of the tax as so assessed. Such check was received by the Secretary of State on June 20, 1933, was endorsed by him to the State Treasurer on June 26, 1933, and subsequently cashed.

On June 17, 1933 a meeting of the stockholders of claimant corporation was held, and a resolution adopted decreasing the amount of the issued capital stock from 29,000 shares of the par value of $100.00 each, to 100 shares of the par value of $100.00 each;—such decrease being effected in the following manner, to-wit:—by the surrender of the 29,000 issued shares of capital stock, by the holders thereof, and the issue to them in lieu thereof of 100 shares of the par value of $100.00 each; so that each holder received 1/290 of a share of stock for each share previously held; and by the creation of a capital surplus of $2,890,000.00.

Pursuant to such resolution claimant made application in regular form to the Secretary of State for a reduction of its capital stock, and on June 29, 1933 the Secretary of State issued his certificate under the seal of the State, setting forth that the claimant had legally decreased its stock as set forth in the aforementioned resolution.

On the same date the Secretary of State also issued and subsequently mailed to the claimant a corrected statement showing a franchise tax due and owing from claimant in the amount of $10.00 on all of its issued capitalization of $10,000.00. Sometime during the early part of July, 1933 claimant received this corrected statement and on July 20,

1933 issued its check in payment therefor. Thereafter and on the 22nd of July, 1933, the Secretary of State wrote claimant in part as follows:

"As it would appear that above company paid franchise tax under date of June 20, I am returning check for $10.00."

However, the check was not enclosed in the letter and is still outstanding.

Thereafter some correspondence was had between the claimant and its attorneys on the one hand, and the Secretary of State on the other, relative to the matter, and on August 1, 1933 the Secretary of State advised the attorneys for the claimant in part as follows:

"The practice has obtained in this office where a decrease is made on or before June 30 that the company is assessed on the new capital stock for the year following.

"Since, however, these fees were paid before the companies decreased their capital stock and have been turned into the State treasury it would appear that the only way they could be recovered at this time would be by filing a bill in the Court of Claims."

The Business Corporation Act of this State became effective on July 13, 1933, the date on which it was filed with the Secretary of State by the Governor without his signature. The last mentioned law expressly repealed the previous General Corporation Act entitled "An Act in Relation to Corporations for Pecuniary Profit," approved June 28, 1919, in force July 1, 1919, as amended.

Section 163 of The Business Corporation Act provides as follows:

"The repeal of a law by this Act shall not affect any right accrued or established, or any liability or penalty incurred, under the provisions of such law, prior to the repeal thereof."

Inasmuch as the Business Corporation Act was not effective until July 13, 1933, and the franchise tax involved in this case was due and payable on July 1, 1933, the rights of the parties hereto must be determined in accordance with the provisions of the aforementioned General Corporation Act of 1919 as amended, which Act continued in force until the time of its repeal by the Business Corporation Act as aforesaid.

It therefore becomes necessary to determine what rights, if any, claimant had acquired under the provisions of The General Corporation Act of 1919, as amended.

The provisions of such Act which are particularly involved in this proceeding are Sections 34, 59, 105, 108, and 109.

Section 34 provided for a reduction of the capital stock by amendment of the charter, and required the amended charter to show the total amount of the stock already authorized and issued, the amount of reduction and the manner in which it should be effected, and also provided:

"* * * The capital stock may be reduced by the surrender by every stockholder of his shares and the issue to him in lieu thereof of a proportional decreased number of shares, if the assets are not reduced thereby, without creating any liability of the stockholders of such corporation in case of the subsequent bankruptcy of such corporation."

Section 59 provided that when the Board of Directors desired to amend the Article of Incorporation by increasing or decreasing the capital stock, they should give notice of such desire in the notice of the annual meeting of stockholders, or they might call a special meeting of the stockholders of such corporation for the purpose of submitting such amendment to a vote of such stockholders.

Section 105 provided that "each corporation for profit * * * shall pay an annual license fee or franchise tax to the Secretary of State of five cents on each one hundred dollars of the proportion of its issued capital stock * * * * * * represented by business transacted and property located in this State", etc.

Section 108 provided that "the franchise tax herein provided to be paid shall be due and payable on the first day of July of each year and shall be the franchise tax for the year commencing on the first day of July in which it is due and ending on the 30th day of June next thereafter."

Section 109 provided as follows:

"The Secretary of State shall, from the annual report filed, assess a tax at the rates herein prescribed, against each corporation required herein to make an annual report," etc.

The provisions of The General Corporation Act of 1919 hereinbefore referred to contain ample authority for the de-

682

crease in the capital stock in the manner adopted by claimant, but make no reference to the effect of such decrease, if any, on the amount of the franchise tax, where the result of the decrease is to create a capital surplus.

In the case of *Interstate Iron and Steel Co.* vs. *Stratton, 340 Ill. 422,* it was held that no additional franchise tax was payable under Section 105 of the 1919 Act, when a corporation changed each of its common shares of $100 par value into five shares of no par value, although at the time of the change the corporation had a large surplus. The same conclusion was reached in the case of a split-up of shares of no par value. *O'Gara Coal Co.* vs. *Emmerson,* 326 Ill. 18; *The Fleschman Co.* vs. *Emmerson,* 326 Ill. 40.

The case of *The People* vs. *Emmerson, 305 Ill. 348,* involved the question as to the amount of the annual franchise tax which a certain corporation was required to pay. In considering that question, the court said:

"The tax required by Section 105 above quoted, to be paid by corporations doing business in this State is a tax on the authorized capital stock of such corporations. It is not a property tax and so the value of the corporate assets does not in any way measure the amount of the tax to be paid. In construing Section 105 it is necessary to keep in mind the distinction between capital stock and capital. The capital stock of a corporation is the sum total fixed by the charter or articles of incorporation as the amount paid in or to be paid in as the capital upon which the corporation is to do business. The capital may be increased by surplus profits or diminished by losses, but this does not increase or diminish the amount of capital stock. The funds or capital of the company may fluctuate; its capital stock remains invariable until changed by authority of the State."

The case of *Majestic Utilities Corporation* vs. *Stratton, 353 Ill. 86,* involved the franchise tax of a corporation which had transferred all of its assets to another corporation in exchange for shares in the latter. Most of these shares had been distributed to shareholders of the former corporation upon a surrender of their shares. The shares so surrendered were actually cancelled and retired pursuant to resolutions adopted by the directors and more than two-thirds of the shareholders, and such cancellation and retirement was stated in the annual report, although no steps were taken to reduce the capital stock under Section 34 or 59 of the 1919 Act. The court held that the franchise tax should be computed only with respect to the shares not so cancelled and retired.

In the consideration of that ʿcase the court, on page 93, said:

"Whatever doubt or uncertainty there might be in this regard, it is a fundamental rule of statutory construction that taxing statutes must be construed strictly. (*People* vs. *Chicago and Eastern Illinois Railway Co.*, 314 Ill. 596). In interpreting statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government and in favor of the citizen. (*Gould* vs. *Gould*, 245 U. S. 151; *Bowers* vs. *New York and Albany Lighterage Co.*, 273 id. 346.)"

In the case of *Armstrong* vs. *Emmerson, 300 Ill. 54,* the court, in considering the meaning of the words "capital stock" in connection with the franchise tax required to be paid thereon under the Act of 1919, said:

"It is this invariable sum fixed by the charter as the amount to be paid in by the stockholders for the prosecution of the business of the corporation and for the benefit of the corporate creditors which is ordinarily understood by the term 'capital stock' unless the context indicates a different meaning. The capital stock is not the same thing as the capital of the corporation or its actual property, the value of which may fluctuate from time to time. However much the value of the property of the corporation may increase in the prosecution of a successful enterprise or may be diminished by losses incurred, the capital stock remains unchanged. The fees and franchise taxes which every corporation must pay under the General Corporation Act are fixed by Sections 96 to 107, inclusive, of that Act."

We do not find any case in which the question here involved has been squarely placed before our Supreme Court. The Opinions of the Attorney General for 1933, page 239, indicate, however, that this precise question was presented to the Attorney General by the Secretary of State in February, 1933. In replying to the inquiry of the Secretary of State with reference thereto, the Attorney General there said:

"I do not find any provision in the Corporation Act which would prevent a corporation from decreasing its capital stock in such a way as to create a surplus, which could then be distributed to its stockholders, as provided by the certificate of decrease submitted to you by the above named corporation, and therefore I am of the opinion that you should accept this amendment and file it in your office.

"Neither do I find any provision in the Corporation Act which would prevent a corporation from issuing its capital stock at a price which would create a surplus above the amount of the capital stock, which surplus might

be used for the purpose of carrying on the business of the corporation. Such a surplus would provide greater security for the creditors of the corporation and therefore could not be detrimental to them or the public generally.

"While the creation of a surplus by the methods suggested would reduce the amount of capital stock and thereby reduce the franchise tax to be paid, I am of the opinion that such a surplus may be provided by the corporation and used in its business or distributed to its stockholders, without liability for the payment of a franchise tax on such surplus, under the present provisions of our Corporation Act."

The question as to the right of a corporation to a refund of franchise tax paid, where there was a decrease of the capital stock, has heretofore been considered by this court in the following cases, to-wit: *Interstate Iron & Steel Co.* vs. *State, 4 C. C. R. 218; Big Four Wilmington Coal Co.* vs. *State, 4 C. C. R. 279; Perfection Stove Co.* vs. *State, 5 C. C. R. 268.*

In the *Interstate Iron and Steel Co.* case, claimant originally had a capital stock of $7,000,000.00 and paid a franchise tax of $3,500.00 thereon for the year commencing July 1, 1920. On April 26, 1920 it filed in the office of the Secretary of State a certificate decreasing its stock to $6,801,900.00, pursuant to which its franchise tax should have been $3,400.95. Claimant therefore overpaid the sum of $99.05 and an award was entered for that amount.

In *The Big Four Wilmington Coal Co.* case, the corporation had a capital stock of $650,000.00. For some time prior to March 1, 1922 it had not been actively engaged in business but was liquidating its assets which did not exceed $13,000.00 on said first day of March, 1922. On March 6, 1922 the capital stock of the corporation was reduced from $650,000.00 to $13,000.00, and a certificate of reduction was duly filed in the office of the Secretary of State. Thereupon all shares of stock issued by the corporation were surrendered, and in lieu thereof shares were issued to the stockholders in the proportion of the reduced capital stock to the original capitalization of the Company. A franchise tax in the amount of $325.00 for the year beginning July 1, 1922 was assessed against the Company on the total capital stock of $625,000.00 whereas the amount of such tax based upon a capital stock of $13,000.00 should have been $10.00. Award was entered allowing the claimant the amount of the overpayment, to-wit, $315.00.

In *The Perfection Stove Company* case the claimant was an Ohio corporation authorized to do business in this State and having a capital stock of $10,000,000.00. On February 2, 1924 it filed a certificate of increase of capital stock from $10,000,000.00 to $15,000,000.00 and on June 2, 1924 filed a certificate of decrease of capital stock from $15,000,000.00 to $10,000,000.00. Franchise tax for the year commencing July 1, 1924 and ending June 30, 1925 was assessed on the capital stock of $15,000,000.00, to-wit, a tax of $1,000.00, whereas the tax on the capital stock as it existed on July 1, 1924, to-wit, $10,000,000.00, would have been $443.75. In this case award was entered for the amount of the overpayment, to-wit, $556.25.

It appears therefore, that before a corporation can be required to pay a franchise tax, it is necessary that there be some statutory provision subjecting it to such tax, and such statutory provision, under the decisions of the courts, must be strictly construed. Under the statutes in force at that time, the claimant had the right to decrease its capital stock by the method and in the manner which it pursued. There was nothing in the law which prevented it from making such decrease in capital stock and thereby increasing its capital assets. The mere fact that the effect of such decrease in the capital stock would enable the claimant to avoid the payment of practically all of its franchise tax, does not deprive it of its legal rights in the matter. The effect of such decrease was a matter for the Legislature, and if the Legislature did not see fit to provide for such contingency, we have no authority to do so.

In this connection it is worthy of note that the Legislature in enacting The Business Corporation Act, provided therein that a surplus created by a decrease in stated capital is to be regarded as paid-in surplus, and that the franchise tax is based upon the stated capital and paid-in surplus.

The Legislature having authorized the claimant to make a reduction in its capital stock and thereby increase its capital surplus, without providing any means for the collection of a franchise tax on such capital surplus, we have no authority to say that the claimant should be required to pay a franchise tax thereon.

686

Under the law in force on July 1, 1933, the date on which the tax was payable, the franchise tax which claimant was required to pay was $10.00. It had previously paid a franchise tax of $1,450.00, being the amount properly assessed against it by the Secretary of State upon its capital stock as it existed at the time of the making of its capital stock tax return, and at the time of such assessment.

Having overpaid the sum of $1,440.00, without any fault on its part, claimant is entitled to a return thereof.

Award is therefore entered in favor of the claimant for the sum of Fourteen Hundred Forty Dollars ($1,440.00).